**LATVIAN STATE CARGO & PASSENGER S. S. LINE v. McGRATH, Attorney General.**

**No. 10131.**

United States Court of Appeals District of Columbia Circuit.

Decided Feb. 23, 1951.

---

Philip Adler, Washington, D. C., of the Bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Horace S. Whitman, Wash-ington, D. C., was on the brief, for appellant.

James L. Morrisson, Attorney, Department of Justice, Washington, D. C., with whom Joseph Laufer, Attorney, Department of Justice, Washington, D. C., was on the brief, for appellee.

Before STEPHENS, Chief Judge, and WILBUR K. MILLER and PRETTY-MAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is a civil action brought by appellant under Section 9(a) of the Trading With the Enemy Act[1] against the Attorney General as Successor to the Alien Property Custodian. Appellant seeks to recover funds representing the proceeds of insurance and the earnings of three vessels,[2] sunk by enemy action in 1942, which proceeds had been acquired, through vesting orders, by the Alien Property Custodian. Appellee filed a motion for summary judgment, supported by affidavits with exhibits. An affidavit, with exhibits, in opposition was filed. The court granted the motion. This appeal followed.

The three vessels were originally owned by citizens and residents of the Republic of Latvia. In June, 1940, armies of the Union of Soviet Socialist Republics occupied Latvia, and pursuant to that occupation a new government, the Latvian Soviet Socialist Republic, was set up. On July 22, 1940, the Saeima of the Republic of Latvia declared the nationalization of all large commercial, industrial and transport enterprises and instructed the government to prepare a list of enterprises and institutions to be nationalized. On October 5, 1940, the nationalization of shipping enterprises of juridical and natural persons was decreed by the Presidium of the Supreme Soviet of the Latvian Soviet Socialist Republic pursuant to Article 6 of the Constitution of that Republic. Plaintiff-appellant is a

---

1. 40 Stat. 419 (1917), as amended, 50 U. S.C.A.Appendix, § 9(a).

2. The complaint also included claim to a fund of approximately $40,000, vested under Order No. 2092, but neither the briefs nor the record contain further description or discussion of that fund. We therefore do not give it any separate consideration.

public corporation organized under the laws of the Union of Soviet Socialist Republics. Its claim of title to the funds here involved rests upon the effect and operation of the nationalization decrees.

None of the three vessels was in Latvian waters subsequent to 1939. In 1941 they were in New York, and libels were filed against them on behalf of the pre-nationalization owners. The present appellant intervened. Trustees were appointed for the vessels. Earnings derived from the operation of the vessels came into the hands of the trustees, and in 1942, the vessels having been sunk, the proceeds of the insurance came into their hands. In 1943, Germany having invaded Latvia, the Alien Property Custodian issued his vesting orders against the property and interests in the hands of the trustees. Germany having been defeated and Latvia having been reoccupied by the Union of Soviet Socialist Republics, the Latvian Soviet Socialist Republic was re-established and the nationalization decrees were restored to effect.

Appellee says that the incorporation of Latvia into the Union of Soviet Socialist Republics and the nationalization decrees of the Latvian Soviet Socialist Republic have not been recognized by the United States, that the executive policy of non-recognition is binding upon the federal courts, and that therefore appellant has no title enforceable in those courts.

The field in which the present dispute lies is a wide one, and much has been written upon the general subject. The cases and authorities have been collected elsewhere,[3] and it is unnecessary for us to venture upon a broad discussion of the general principles involved.

The conduct of foreign affairs is, of course, a function of the executive branch of the Government, and the judicial branch has no part in it or control over it.[4] It is settled by United States v. Belmont[5] and United States v. Pink[6] that if there is a formal act by the executive department, either of recognition or of compact, the courts must give full effect to the terms of such act. Our problem, however, does not deal with such an affirmative act.

Moreover we do not have before us a mere failure to recognize in the absence of a strong executive policy against condoning in any way the Soviet occupation of Latvia. It might well be that in the absence of such a policy the usual rules applicable under the established doctrines of conflicts of laws would apply. Thus, in Compania Espanola De Navegacion Maritima, S. A. v. Navemar[7] and in M. Salimoff & Co. v. Standard Oil Co.,[8] the State Department refused to certify a policy of hostility to decrees of the un-recognized governments, and the courts accordingly applied those doctrines in arriving at their decisions. Even granting the application of such doctrines, however, there is no assurance that appellant should prevail here. There is, for example, the view suggested by Judge Goodrich, concurring in The Maret,[9] that in the absence of recognition of a foreign government the courts might deny effect to an act of that government which purports to change the ownership of a chattel absent from its borders. In a similar vein is the state-

---

3. Guaranty Trust Co. v. United States, 1938, 304 U.S. 126, 58 S.Ct. 785, 82 L. Ed. 1224; Oetjen v. Central Leather Co., 1918, 246 U.S. 297, 38 S.Ct. 309, 62 L. Ed. 726; The Maret, 3 Cir., 1944, 145 F.2d 431; Banque de France v. Equitable Trust Co., D.C.S.D.N.Y., 1929, 33 F. 2d 202, affirmed, 2 Cir., 1932, 60 F.2d 703; Connick, The Effect of Soviet Decrees in American Courts, 34 Yale L.J. 499 (1925); Borchard, The Unrecognized Government in American Courts, 26 Am.J.Int'l L. 261 (1932); 58 Harv. L.Rev. 612 (1945); 93 U. of Pa.L.Rev. 323 (1945).

4. United States v. Curtiss-Wright Export Corp., 1936, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255.

5. 1937, 301 U.S. 324, 57 S.Ct. 758, 81 L. Ed. 1134.

6. 1942, 315 U.S. 203, 62 S.Ct. 522, 86 L. Ed. 796.

7. 1938, 303 U.S. 68, 58 S.Ct. 432, 82 L. Ed. 667.

8. 1933, 262 N.Y. 220, 186 N.E. 679, 89 A. L.R. 345.

9. 3 Cir., 1944, 145 F.2d 431, 444.

ment in Compania Espanola v. Navemar[10] to the effect that, where confiscatory decrees are *in invitum*, actual possession by some act of physical dominion or control in behalf of the confiscating government is necessary. No such showing was made in the case at bar. And, furthermore, there is the possible view that, since the nationalization decrees here involved were confiscatory and thus contrary to the public policy of this country, our courts would in no event give them effect.[11] In the view we take, however, it is unnecessary to consider those possibly applicable rules.

In the case at bar it appears that the non-recognition of the nationalization decrees was the result of a deliberate policy of the executive branch of the Government. The record contains three affidavits of the Secretary of State. In pertinent parts they read as follows:

"I Certify That the legal existence of the Treaty of Friendship, Commerce and Consular Rights, as well as of all other treaties between the United States and the Republic of Latvia has not been affected by any of the acts of the Soviet regime which assumed power in Latvia in 1940, or of any subsequent regime in that country."

"I Certify that the incorporation of Latvia by the Union of Soviet Socialist Republics is not recognized by the Government of the United States."

"I Certify That the legality of the so-called 'nationalization' laws and decrees,

or of any of the acts of the Soviet regime which assumed power in Latvia in 1940, or of any subsequent regime in that country has not been recognized by the Government of the United States." These affidavits are consistent with the announced foreign policy of this Government.[12]

We are of opinion that when the executive branch of the Government has determined upon a foreign policy, which can be and is ascertained, and the non-recognition of specific foreign decrees is deliberate and is shown to be part of that policy, such non-recognition must be given effect by the courts. The rule applicable in such circumstances is the same rule applicable to an act of recognition. Any other treatment of a deliberate policy and act of non-recognition would reduce the effective control over foreign affairs by the executive branch to a mere effectiveness of acts of recognition. The control of the executive branch over foreign affairs must necessarily be broader than that.

While this specific point was not before the Court in United States v. Pink, supra, the view which we have expressed was definitely indicated in the opinions in that case.

We find ourselves in agreement with other courts which have either implicitly or explicitly recognized the policies of their governments in refusing to countenance the confiscation of vessels by Soviet regimes subsequent to the occupation of those countries by the Union of Soviet

10. Supra at 303 U.S. 75, 58 S.Ct. 432.

11. Fred S. James & Co. v. Second Russian Ins. Co., 1925, 239 N.Y. 248, 146 N.E. 369, 37 A.L.R. 720; Petrogradsky Mejdunarodny Kommerchesky Bank v. Nat. City Bk., 1930, 253 N.Y. 23, 170 N.E. 479; Sokoloff v. National City Bank, 1924, 239 N.Y. 158, 145 N.E. 917, 37 A.L.R. 712; Laane and Baltser v. Estonian State Cargo and Passenger Steamship Line, [1949] 2 D.L.R. 641 (Can.Sup.Ct.). Compare also the results reached in litigation subsequent to the Civil War involving acts of Confederate state legislatures, where the courts inclined to a public policy view in according or denying validity to such acts.

12. Letter of Feb. 23, 1932, from Secretary of State Stimson, Dept. of State Press Releases, weekly issue 126, p. 205, Feb. 24, 1932, 1 Hackworth, Digest of International Law 334–335 (1940); Statement by the Acting Secretary of State, July 23, 1940, Press Release No. 354, N.Y. Times, July 24, 1940, pp. 1, 8; Letters from State Department to Governors of the States, N.Y. Times, March 30, 1948, p. 12; Art. 17 of the Charter of the Organization of American States, signed at Bogota, March 30–May 2, 1948; Department of State Press Release No. 119, Feb. 15, 1951.

Socialist Republics and so have refused to effectuate those confiscations, regardless of the results which would normally be reached under the rules governing conflicts of laws.[13]

The judgment of the District Court is Affirmed.

STEPHENS, Chief Judge, concurs in the result.

13. The Maret, 3 Cir., 1944, 145 F.2d 431; The Kotkas, D.C.E.D.N.Y., 1940, 35 F. Supp. 983; In re Graud's Estate, Sur., 1943, 43 N.Y.S.2d 803; Laane and Baltser v. Estonian State Cargo and Passenger Steamship Line, [1949] 2 D.L.R. 641 (Can.Sup.Ct.); Zarine v. Owners of SS Ramava, [1942] Ir.R. 148 (Ir. Sup.Ct.); Boguslawski v. Gdynia Ameryka Linie, [1950] 2 All Eng. 355 (C.A.). See also Bernstein v. Van Heyghen Freres Societe Anonyme, 2 Cir., 1947, 163 F. 2d 246, and Bank of China v. Wells Fargo Bank & U. T. Co., D.C.N.D.Cal., 1950, 92 F.Supp. 920, 39 Geo.L.J. 337.