**BANK OF CHINA v. WELLS FARGO BANK & UNION TRUST CO.**

Nos. 29287, 29703.

United States District Court
N. D. California, S. D.
March 17, 1952.

**60**

A. Crawford Greene, Morris M. Doyle, Owen Jameson, McCutchen, Thomas, Matthew, Griffiths & Greene, San Francisco, Cal., James B. Burke and Burke & Burke, all of New York City, for plaintiff.

Robert W. Kenny, Los Angeles, Cal., Martin Popper, and Wolf, Popper, Ross & Wolf, all of New York City, Benjamin Dreyfus, Francis J. McTernan, Jr., San Francisco, Cal., seeking to be substituted as attorneys for plaintiff.

Heller, Ehrman, White & McAuliffe, Lloyd W. Dinkelspiel, and Martin Minney, Jr., all of San Francisco, Cal., for defendant.

GOODMAN, District Judge.

Plaintiff, a Chinese corporation, filed these actions to recover the total sum of $798,584.64 on deposit in the defendant Bank. Defendant Bank filed answers asserting its willingness to pay the sum, but alleging that it was unable to do so because of conflicting claims of corporate authority to receive payment. Thereafter the attorneys for the plaintiff moved for summary judgment in plaintiff's favor. Later, a second group of attorneys, claiming that they were the only attorneys empowered to represent the plaintiff Bank of China, filed a motion to dismiss these actions or in the alternative to substitute themselves as the attorneys for the plaintiff. These motions were argued and submitted to the Court for decision.

On July 17, 1950, the Court filed its opinion [1] wherein it directed the disposition of the cause, in accordance with an order providing as follows:

"1. That the trial of this cause will be continued sine die;

"2. That the said motion for summary judgment is denied without prejudice;

"3. That said motion for dismissal or in the alternative for substitution of attorneys is denied without prejudice;

"4. That the defendant is hereby permitted to deposit in the Registry of this Court the said sum of $798,584.64, subject to the further order of this Court pending a decision herein on the merits;

"5. That the defendant Wells Fargo Bank & Union Trust Co., shall be and it is hereby relieved of any and all claims for interest for use of the fund or because of its failure or refusal to pay said fund to plaintiff Bank of China or any other claimant thereto which may now or hereafter be asserted against it by plaintiff or any other claimant to said fund or any part thereof, upon condition that it deposit the sum of $798,584.64 in the Registry of this Court within ten (10) days from the date hereof;

"6. That upon the defendant's depositing said sum as provided in paragraph 5

---

1. 92 F.Supp. 920. Reference is made to the opinion for a full statement of the legal and factual issues then before the court.

hereof, it shall be and is hereby discharged of and from all liability in the premises either to plaintiff Bank of China or to anyone claiming through or on behalf of plaintiff, and plaintiff and all those persons now before this Court who are assertedly acting in the name of plaintiff are restrained from enforcing or attempting to enforce any claim or claims against said defendant relating to said sum of money or said deposit or from taking any proceedings against defendant in relation thereto;

"7. That there is reserved to defendant the right to assert against said fund and to prove its costs and attorneys' fees reasonably incurred in this action."

An appeal was taken from the foregoing order. Subsequently the Court of Appeals dismissed the appeal without prejudice and remanded the cases to this Court, stating: "The District Court may deem it expedient to re-examine the case in the light of changing world conditions and such additional evidence as may be made available to it by the respective parties." 190 F.2d 1010, 1012. Thereafter plaintiff renewed its motion for summary judgment and the intervening attorneys renewed their motion to dismiss or in the alternative for their substitution as attorneys for plaintiff. The motions came on for hearing on November 20, 1951. Additional documentary evidence was presented; the motions were argued and submitted on briefs thereafter filed.

Pursuant to the direction of the Court of Appeals, this Court is now in a position to re-examine the cases in the light of the additional evidence and "changing world conditions."

Not only has additional documentary evidence been submitted, but there is no doubt that "world conditions" *have* materially changed since the Court's decision of July 17, 1950. On the present record, the Court can justly and properly decide these motions without further continuance sine die.

The question now presented is essentially one of law. The attorneys who initiated this action contend that the controlling corporate authority of the Bank of China is vested by its Articles of Association in the Nationalist Government of China. They note that the Bank of China was directed by representatives of that Government when the deposit in suit was made. The Nationalist Government, they point out, not only still exists, but is the only government of China recognized by the United States. The Bank of China, they assert, still functions under the control of the Nationalist Government at its present seat on the Island of Formosa and at branch offices in various parts of the world. The Bank of China, so functioning, is the plaintiff in this action, they say, and the rightful claimant to the deposit in suit.

The intervening attorneys contend that the Peoples Government of China, as the successor in fact to the Nationalist Government in continental China, has succeeded to the corporate rights of the Chinese State in the Bank of China. They allege that the operations of the Bank of China throughout the Chinese Mainland and in certain branch offices abroad are now conducted by new Government directors appointed by the Peoples Government in conjunction with the directors representing private stockholders. It is only through these banking operations, they argue, that the corporate purposes of the Bank of China are now being realized. Only through operations so conducted, they say, can the rights of the Chinese State as majority stockholder and those of the private investors be given any substance. Such corporate operations, the intervening attorneys urge, are the true indicia of rightful ownership of the deposit.

The issue before the Court has therefore been reduced to a comparatively narrow one. It appears from the record, that there are two Banks of China now functioning. The question is: Which Bank of China is legally entitled to the deposit in suit?[2] For convenience, the plaintiff will hereafter be referred to as the "Nationalist" Bank of China, and the Bank of China represented by the intervening attorneys as the "Peoples" Bank of China.

2. Counsel have agreed that this is the issue. 129, 130.) (Record of November 20, 1951, Tr. pp. 128,

■ At the outset, the Court must determine whether these causes may finally be disposed of by summary judgment. Rule 56(c), F.R.C.P., 28 U.S.C. If there is "a genuine issue as to a material fact," summary disposition of the causes cannot be made. This does not mean that *any* factual dispute bars summary judgment. The dispute must be as to *material* facts; and the issue thus resulting must be "genuine."

Fairly summarized, the showings made for and against the motion for summary judgment follow:

For the "Nationalist" Bank of China:

The Articles of Association of the Bank of China show that it was established in 1912. It was reorganized in 1928 as an international exchange bank under special charter of the Nationalist Government, and its status was revised in 1935 by order of the Ministry of Finance. At that time one half of the Bank's capital stock was held by the Government and one half by private investors of Chinese nationality. In 1942 the status of the Bank was again revised by Government decree whereupon the Government invested additional funds and became the holder of two-thirds of the capital stock. Since the 1942 revision, 13 of the 25 authorized directors have been appointed by the Minister of Finance on behalf of the Government, and the remaining 12 have been elected by the private stockholders. Thirteen directors constitute a quorum. In addition to the power to conduct ordinary domestic and foreign banking, the Articles of Association entrust the Bank with the authority to issue government bonds in foreign markets and to handle public funds deposited abroad as well as government treasury funds. The Minister of Finance is authorized by the Articles to restrain any action of the Bank in violation of the Articles or detrimental to the Government. Duly authenticated certificates of the Minister of Finance of the Nationalist Government and the Secretary of the Bank of China set forth the governmental decrees and directors' resolutions by which, during the year 1949, the head office of the Bank was moved from Shanghai respectively to Canton, Chungking, and finally to Taipeh, Formosa, as the armies of the Nationalist Government retreated before revolutionary forces. Other certificates of the Secretary of the Bank and the Nationalist Minister of Finance attest to the ratification of these suits on behalf of the Nationalist Bank of China by the Board of Directors and the Nationalist Government, as majority stockholder.

For the "Peoples" Bank of China:

By affidavits, several of the intervening attorneys and one Frederick Field, a United States citizen resident in New York City who claims to be the attorney-in-fact for the Peoples Bank of China, attest to the following facts: In May of 1949, the Chinese Peoples' Liberation Army took possession of the physical plant of the Head Office of the Bank of China in Shanghai. The powers of the Board of Directors of the Bank in respect to its operations in the area controlled by the Peoples' Army were then vested in an organization denominated "East China Finance and Economic Administration." By October of 1949, the so-called "Peoples Government" had supplanted the Nationalist Government in dominion over the Chinese Mainland. The Peoples Government, claiming to have succeeded to the ownership of the Government stock in the Bank of China, then appointed new Government directors and officers for the Bank and moved the Head Office from Shanghai to Peiping. The corporate authority of ten of the twelve directors, who, since 1948, have represented the private shareholders, has been recognized by the Peoples Government. On April 9, 1950, seven of these directors, in person or by proxy, met with the new government directors to conduct the operations of the Bank. Since then the recognized private directors, in person or by proxy, and the new government directors have continued to administer the affairs of the Bank of China on the Chinese Mainland and in areas abroad where the Peoples Government is recognized. Copies of the minutes of certain of the meetings of these directors duly certified by the Secretary of the Peoples Bank of China are ap-

pended to the affidavits of the intervening attorneys.

The affidavits, certificates, and other documents proffered by the plaintiff and the intervening attorneys are in conflict only in the sense that they allege facts in support of adverse claims to the funds deposited with the defendant Bank. The events and transactions set forth by both sides are not reciprocally denied. Only the legal effect of the factual occurrences and the conclusions to be drawn from them are in dispute. Thus the Court may assume the truth of the facts set forth by both sides and be required to decide only the legal effect. Consequently there is no genuine issue of material fact requiring a further hearing or trial.

█ True, the intervening attorneys have questioned the legal sufficiency of some of the certificates as to corporate proceedings offered in support of the motion for summary judgment. But, the Court is of the opinion that their contentions are not substantial and are without merit. Therefore, the Court holds that the cause may properly be determined on the motion for summary judgment.

Consequently, we now reach the question: Which Bank of China is legally entitled to the funds deposited with the defendant Bank?

The controlling corporate authority of the Bank of China is effectively vested in the Government of China by virtue of its majority stock ownership, its dominant voice in the managing directorate, and the supervisory powers accorded by the Articles of Association to the Minister of Finance. A determination of what government, if any, should be recognized by this court as now entitled to exercise this corporate authority over the deposit in suit, will govern the disposition of these causes.

The issue thus posed focuses attention at the outset on the fact that of the two governments asserting corporate authority, one is recognized by the United States while the other is not. If this fact, per se, is determinative, the issue is resolved. If whenever this court is called upon to determine whether there is a government justly entitled to act on behalf of a foreign state in respect to a particular matter, the court is bound to say, without regard to the facts before it, that the government recognized by our executive is that government, then nothing more need be said here. To permit this expression of executive policy to usurp entirely the judicial judgment would relieve the court of a burdensome duty, but it is doubtful that the ends of justice would thus be met. It has been argued that such is the accepted practice. But the authorities do not support this view.

There is, of course, the long line of New York decisions arising out of the nationalization of Russian corporations by the Soviet Government at a time when it was unrecognized by the United States.[3] In those decisions, the New York courts stated time and again that no effect would be given to the acts of the unrecognized Soviet Government, in so far as property situated in this country was concerned. But in every instance, the governmental acts, which the courts chose to ignore, were acts of confiscation. Confiscatory acts were held to be repugnant to the public policy of the forum. Public policy, rather than the unrecognized status of the Soviet Government, shaped the decisions in the Russian nationalization cases. This, the Court of Appeals of New York has expressly stated.[4] Such decisions do not bar the way to giving effect to acts of non-recognized governments even in respect to property within our borders, if justice so requires.

Some more recent decisions of the federal courts, involving Soviet nationalization of corporations of the Baltic states, give great weight to the executive policy of

3. These cases, in major part, are collected in United States v. President and Directors of the Manhattan Co., 1938, 276 N.Y. 396, 403, 12 N.E.2d 518, 521.

4. Vladikavkazsky R. Co. v. New York Trust Co., 1934, 263 N.Y. 369, 378–379, 189 N.E. 456, 91 A.L.R. 1426.

non-recognition.[5] But it cannot be said that these decisions establish an all-embracing rule that no extra-territorial effect may ever be given the acts of an unrecognized government.

Nor, as has been argued, does the decision of the Supreme Court in United States v. Pink, 1942, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796, impose upon this court a duty to give conclusive effect to every act of a recognized government. Pink requires that full faith and credit be accorded those acts which our executive has expressly sanctioned. But such executive sanction is not expressed by governmental recognition per se.[6]

The decisions just set forth, as well as others in this field, reveal no rule of law obliging the courts to give conclusive effect to the acts of a recognized government to the exclusion of all consideration of the acts of an opposing unrecognized government. Nor does it appear that such a sweeping rule would be a sound one.

Even were the court solely concerned with the implementation of our executive foreign policy, it would be presumptuous to blindly effectuate every act of a recognized government or to treat every act of an unrecognized government as entirely fictional. Early in our national history, our recognition policy was generally based on the executive's view of the stability and effectiveness of the government in question. More recently recognition has been granted and withheld at the diplomatic bargaining table.[7] Our policy has thus become equivocal. Conflicting considerations are balanced in the executive decision. Moreover, an act of recognition does not necessarily mark a sudden reversal in executive policy. It may come as a culmination of a gradual change in attitude. Thus the import of recognition or non-recognition may vary with time and circumstance.

Recognition is not intended to sanctify every act, past and future, of a foreign government. The withholding of recognition may cast a mantle of disfavor over a government. But, it does not necessarily stamp all of its acts with disapproval or brand them unworthy of judicial notice. Our executive, on occasion, has even entered into a treaty with an unrecognized government.[8]

■ This is not to suggest that the courts should regard executive policy in respect to recognition and non-recognition of foreign governments as meaningless or of little consequence. In any particular situation, executive policy may be crucial, as indeed it appears to be in the present case. But, it is a fact which properly should be considered and weighed along with the other facts before the court.[9]

Turning to the record in this case, it appears that two governments are governments in fact of portions of the territory of the State of China. The "Peoples" Government has supplanted the "Nationalist" Government in dominion over the entire Chinese Mainland with an area of more than 3,700,000 square miles, and a population of more than 460,000,000. The "Nationalist"

5. Latvian State Cargo & Passenger S. S. Line v. McGrath, 1951, 88 U.S.App.D.C. 226, 188 F.2d 1000; The Maret, 3 Cir., 1944, 145 F.2d 431; The Florida, 5 Cir., 1943, 133 F.2d 719. But cf. The Denny, 3 Cir., 1942, 127 F.2d 404. See Briggs, Non-Recognition in the Courts: The Ships of the Baltic Republic, 37 American Journal of International Law 585 (1943).

6. See Note, United States v. Pink—A Reappraisal, 48 Columbia Law Review 890 (1948).

7. See I Hyde, International Law §§ 44–45D (1945); I Hackworth, Digest of International Law, § 33 (1940); Lauterpacht, Recognition in International Law, §§ 45, 46. (Cambridge University Press 1947.)

8. The United States and Russia, along with 52 other nations, entered into the Kellogg Pact renouncing war as an instrument of national policy in 1929 when the Soviet Government was as yet unrecognized by our executive. 46 Stat. 2343.

9. For helpful discussions of this subject see Brown, The Legal Effects of Recognition, 44 American Journal of International Law 617 (1950); Comment, Effects in Private Litigation of Failure to Recognize New Foreign Governments, 19 University of Chicago Law Review 73 (1951).

Government controls one of the 35 provinces of China, the Island of Formosa, which has an area of 13,885 square miles and a population in excess of 6,000,000. It is obvious that the "Peoples" Government is now the government in fact of by far the greater part of the territory of the Chinese State. Nevertheless the "Nationalist" Government controls substantial territory, exceeding in area that of either Belgium or the Netherlands, and in population that of Denmark or Switzerland.

Each government, in its respective sphere, functions effectively. Each is recognized by a significant number of the nations of the world. Each maintains normal diplomatic intercourse with those nations which extend recognition. This has been the status quo for more than two years.

Each government is in a position to exercise corporate authority in behalf of the Bank of China. That is, each government is capable of utilizing the corporate structure and certain corporate assets to promote the corporate purposes. The Bank of China was chartered primarily to facilitate Chinese international commercial activities. It was organized as an international exchange bank to deal in domestic and foreign exchange and gold and silver bullion, to discount, purchase, and collect commercial bills and drafts, to issue, service, and redeem government bonds in foreign markets, and to handle public funds deposited abroad. It was also authorized to engage in a general domestic banking business including the acceptance of deposits and valuables for safe keeping, the granting of loans, and the issuance and service of domestic government loans. Each government is in a position to act through the corporate structure of the Bank of China to carry on these international functions in the areas abroad where such Government is recognized and these domestic functions within the territory such Government controls. Each government is in fact doing so. The Bank of China, as controlled by the Nationalist

Government, continues to function on the Island of Formosa and through its foreign branches in the United States, Cuba, Australia, Japan, Indo China, and elsewhere where the Nationalist Government is recognized.

The Peoples Government as successor in fact to the Nationalist Government on the Chinese Mainland is exercising the prerogatives of the Government in respect to the Bank of China there. The Peoples Government has not nationalized the Bank of China, nor confiscated its assets, nor denied the rights of private stockholders.[10] It exercises the authority vested in the Government of China as majority stockholder. The Bank of China continues to function in accordance with its Articles of Association under the guidance of the appointees of the Peoples Government and the majority of the directors previously elected by private stockholders on the Chinese Mainland and through branches in London, Hong Kong, Singapore, Penang, Kuala, Lumpar, Batavia, Calcutta, Bombay, Karachi, Chittagong, and Rangoon.

This factual situation is without analogous precedent in any reported case. The resulting legal problem, arising as it does out of sweeping historical changes and the claims of rival governments, cannot be met by the application of technical rules of corporation law.

A year and a half ago, this Court felt that the best course was to withhold judgment. At that time the Nationalist forces had only recently retreated to their last stronghold; their ability to consolidate this position was doubtful. The Peoples Government which had assumed control of the Chinese Mainland had not yet demonstrated its stability. Our executive policy had not assumed definite outlines in the wake of these events. The émigré directors of the Bank who sought control of the deposit in suit could not demonstrate their authority to do so or their ability to apply the funds to corporate purposes. The Bank of China, under new management on the

10. The Peoples Government has declared forfeited the shares of 2 of the 4,579 private stockholders. These two stockholders, who are charged as "war criminals," hold 200 of the 200,000 private shares outstanding.

Chinese Mainland, was not yet functioning normally in accordance with its Articles of Association. Whether its assets there would be employed for corporate purposes or diverted to other ends was not known.

Now time has clarified the picture. Both the Nationalist and Peoples Governments have maintained and strengthened their positions. Our national policy toward these governments is now definite. We have taken a stand adverse to the aims and ambitions of the Peoples Government. The armed forces of that Government are now engaged in conflict with our forces in Korea. We recognize only the Nationalist Government as the representative of the State of China, and are actively assisting in developing its military forces in Formosa. The Bank of China now operates as two corporate entities, each performing within the area of its operations the functions bestowed upon the Bank of China by its Articles of Association. Each Bank of China is in a position to employ the deposit in suit for corporate purposes.

From a practical standpoint, neither of the rival Banks of China is a true embodiment of the corporate entity which made the deposit in the Wells Fargo Bank. The present Nationalist Bank of China is more nearly equivalent in the sense of continuity of management. The Peoples Bank is more representative in ability to deal with the greater number of private stockholders and established depositors and creditors. Were the Court to adopt a strictly pragmatic approach, it might attempt a division of the deposit between these two banks in the degree that each now exercises the functions of the Bank of China. Or the Court might award the entire deposit to the bank it deems to be the closest counterpart of the corporation contemplated by the Articles of Association.

But this, the Court could not do merely by balancing interests of a private nature.

Such a course would ultimately entail determining which bank best serves the corporate interests of the State of China. That determination could not be made, while the State, itself, remains divided, except by an excursion into the realm of political philosophy. Were there only one government, in fact, of the Chinese State, or only one government in a position to act effectively for the State in respect to the matter before the Court, the Court might be justified in accepting such a government as the proper representative of the State, even though our executive declined to deal with it. Here, there co-exist two governments, in fact, each attempting to further, in its own way, the interests of the State of China, in the Bank of China. It is not a proper function of a domestic court of the United States to attempt to judge which government best represents the interests of the Chinese State in the Bank of China. In this situation, the Court should justly accept, as the representative of the Chinese State, that government which our executive deems best able to further the mutual interests of China and the United States.[11]

Since the Court is of the opinion that it should recognize the Nationalist Government of China as legally entitled to exercise the controlling corporate authority of the Bank of China in respect to the deposit in suit, the motion for summary judgment in favor of the Bank of China, as controlled by the Nationalist Government, is granted. The motion of the intervening attorneys to dismiss, or, in the alternative, for their substitution as attorneys for the plaintiff, is denied.

There remain for consideration two collateral questions:

1. Is plaintiff Nationalist Bank of China entitled to interest upon the deposit?

2. May defendant recover its costs, including attorneys fees, from the fund now

11. It might be noted that Professor Edwin M. Borchard, the noted authority on international law, who has been one of the most out-spoken advocates of the view that the executive policy of recognition or non-recognition should rarely enter into the judicial judgment, agrees that in this situation the judicial and executive judgment should coincide. See Borchard, The Unrecognized Government in American Courts, 26 American Journal of International Law, 261, 264, 266 (1932).

on deposit in the registry of the Court?

*Interest:*

██ Ordinarily a bank is liable for interest after failure to pay a deposit to a depositor lawfully entitled thereto. California Civil Code 3302. The facts here do not sustain such liability. Plaintiff had funds on deposit with the defendant Bank in what is commonly described as a general commercial account. No interest was payable by the defendant Bank on such an account. Conflicting claims of authority to withdraw the deposit or a substantial part of it were made upon the defendant Bank. For a statement of the nature and character of these claims see 92 F.Supp. 922. After the institution of this action, in accordance with the order of the Court, the deposit was paid into the registry of the Court on August 14, 1950.

There is no question but that defendant Bank should be relieved of all obligation to pay interest after the deposit was paid into court and the funds were no longer subject to the use of defendant. The legal issues raised by the conflicting claims of authority were real and substantial and their judicial determination was necessary to protect defendant Bank. Conner v. Bank of Bakersfield, 1920, 183 Cal. 199, 190 P. 801. During the period from the initial demand for payment of $600,000 on October 7, 1949 until August 14, 1950, the deposit remained subject to defendant's use. But the Court is of the opinion that the demand was legally insufficient, under the circumstances which then existed, to obligate the defendant Bank to make payment. Even up to the time that the deposit was paid into court, those who sought to receive payment on behalf of the Bank of China, as controlled by the Nationalist Government, had not demonstrated their authority to do so. In view of the confusion which then existed the defendant Bank could not properly have risked making payment to anyone without proof of their corporate authority. Since the Bank was under no obligation to pay interest prior to the demand, the circumstances do not warrant imposing such obligation upon it thereafter.

*Attorneys fees and Costs:*

██ The Court is satisfied that expenses and counsel fees by way of costs may properly be awarded and paid to the defendant Bank out of the funds on deposit in the registry of the Court. Resting upon the defendant was a responsibility both to its depositors and stockholders to see to it that the large sum of money in question was paid to authorized persons. Counsel for defendant Bank proceeded promptly and energetically to protect its rights. Despite the fact that in a technical sense this is not interpleader, the unusual character of this litigation makes it proper and just that the defendant Bank as an innocent third party be not put to expense as a victim of conflicting claims to the fund. In that sense it is entitled to the benefits which accrue to it under formal interpleader. It has long been the established practice of the federal courts to allow an interpleading stakeholder his costs, including a reasonable attorney's fee, out of the fund deposited in court. Globe Indemnity Co. v. Puget Sound Co., 2 Cir., 1946, 154 F.2d 249; Massachusetts Mutual Life Insurance Co. v. Morris, 9 Cir., 1932, 61 F.2d 104; Mutual Life Insurance Co. v. Bondurant, 6 Cir., 1928, 27 F.2d 464. The Court is not unmindful that since Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, a number of federal courts have indicated that in a diversity case, a federal court should follow the state practice in respect to the allowance of attorney's fees. Board of Education v. Winding Gulf Collieries, 4 Cir., 1945, 152 F.2d 382, 386; American Casualty Co. v. Harrison, D.C.W.D.Ark. 1951, 96 F.Supp. 537, 551; Illinois Bankers Life Assurance Co. v. Blood, D.C.N.D. Ill. 1947, 69 F.Supp. 705; Danville Building Association v. Gates, D.C.E.D.Ill. 1946, 66 F.Supp. 706. Concededly, under California law, attorney's fees are not allowable in actions in the nature of interpleader. Calif.Code of Civil Procedure 1021; Pacific Gas & Electric Co. v. Nakano, 1939, 12 Cal.2d 711, 87 P.2d 700, 121 A.L.R. 417; Los Angeles Trust & Savings Bank v. Ward, 1925, 197 Cal. 103, 239 P. 847. But, the Court adheres to the view which it expressed in Kellems v. California CIO Council, D.C. 1946, 6 F.R.D. 358, 361,

that Rule 54(d) of the Federal Rules of Civil Procedure vests a discretionary power in the court with respect to the allowance of costs, including attorney's fees, the exercise of which cannot be curtailed by state legislation.

The affidavit of one of the members of the firm of attorneys representing defendant sets forth that the time consumed by counsel in connection with this litigation amounted to approximately ninety-nine six hour days and that they were "out of pocket" for expenses in the sum of $240.63. No opposing factual showing has been made. Counsel claims the value of the services rendered to be not less than $15,-000.

Taking into account the amount of the res, the importance of the litigation, the status of counsel in the community, the nature of the services rendered and the time spent therein, I am of the opinion that the sum of $10,000 is proper compensation for legal services including those rendered by New York counsel.

Counsel should present an order, to be settled on five days' notice, directing the clerk of the court to pay out of the fund now in the registry of the Court, the sum of $10,240.63 to Messrs. Heller, Ehrman, White & McAuliffe, as attorneys for the defendant, and the balance of the fund to plaintiff.