**REPUBLIC OF PANAMA, Plaintiff,**

v.

**REPUBLIC NATIONAL BANK OF NEW YORK, Bankers Trust Company, Irving Trust Company and Marine Midland Bank, Defendants.**

No. 88 Civ. 1427 (LFM).

United States District Court,
S.D. New York.

March 15, 1988.

Arnold & Porter by William D. Rogers, Daniel A. Rezneck, Kenneth V. Handal, Spencer S. Griffith, Rebecca E. Swenson, Michael D. Schissel, New York City, for plaintiff Republic of Panama.

Alan Katz, Bankers Trust Co., New York City, for defendant Bankers Trust Co.

Sullivan & Cromwell by John W. Dickey, Bruce E. Clark, Joseph E. Neuhaus, New York City, for defendant Marine Midland Bank, N.A.

Slotnick & Baker by Barry I. Slotnick, and Morrison & Foerster by Jack C. Auspitz, New York City, for intervenor Banco Nacional De Panama.

Rabinowitz Boudin Standard, Krinsky & Lieberman, P.C. by Terry Gross, New York City, and Baratta & Fenerty, Ltd. by Anthony P. Baratta, John F.X. Fenerty, Philadelphia, Pa., for intervenor Republic of Panama.

## OPINION

MacMAHON, District Judge.

Plaintiff, the Republic of Panama, moves for a preliminary injunction. The action seeks to establish title to funds held by defendants, Marine Midland Bank ("Marine") and Bankers Trust Company ("Bankers Trust"), and to enjoin defendant banks from transferring funds except as directed by plaintiff's representative, Ambassador Juan B. Sosa ("Ambassador Sosa"). Asserting a property interest in the funds, Banco Nacional de Panama ("Banco Nacional") and representatives claiming to act for the Republic of Panama move to intervene as of right, pursuant to Rule 24(a)(2), Fed.R.Civ.P.

## BACKGROUND

This action arises out of recent political turmoil in the Republic of Panama. On February 25, 1988, President Eric Arturo Delvalle ("Delvalle") dismissed General Manuel Noriega ("Noriega") as Commander of the Panamanian Defense Forces. Noriega refused to step down, and on February 26, 1988 he allegedly instigated the removal of Delvalle from office by vote of the National Assembly. Subsequently, the Cabinet Council named Manuel Solis Palma ("Palma") as "Minister in Charge of the Presidency of the Republic."

The United States recognizes only Delvalle as the lawful president of Panama and has expressed support for the Delvalle government in official State Department statements[1] and in meetings of the Organization of American States.[2]

On March 1, 1988, Delvalle issued a proclamation, as "the lawful President of the Republic of Panama," declaring the "Noriega regime" illegitimate and illegal, and advising all interested parties that any transactions with the Noriega regime would not be recognized by, or considered binding upon, the Republic of Panama. In addition, Ambassador Sosa notified Marine, Bankers Trust, Republic National Bank of New York ("Republic") and Irving Trust Company ("Irving"), by letter, that the Delvalle government was the only lawful

---

1. For example, in a press briefing on February 25, 1988, State Department spokesperson Phyllis Oakley stated: "We continue to express our strong support for the supremacy of civilian constitutional rule. We continue to recognize President Delvalle as the President of Panama."

2. On February 27, 1988, in a statement at the Special Session of the Permanent Council of the Organization of American States to consider the situation in Panama, United States Permanent Representative Richard T. McCormack declared: "The ten minute action of part of the Panamanian Legislature, acting as the agent for a military strongman to depose President Delvalle was a charade. The United States therefore continues to recognize President Delvalle as the President of Panama."

government of the Republic of Panama; that the United States recognized it as such; and that no debit or payment of any kind should be made against any accounts of the Republic of Panama or its agencies or instrumentalities without authorization from Ambassador Sosa as the legal representative of Panama in the United States.

On March 2, 1988, we granted plaintiff's application for a temporary restraining order enjoining Republic from debiting any account of the Republic of Panama. Plaintiff later filed an amended complaint naming Marine, Bankers Trust and Irving as defendants. Still later that day, Republic agreed to transfer all funds in the account of the Republic of Panama to the Federal Reserve Bank of New York, and the action against Republic was dismissed.

Also on March 2, 1988, the Acting Secretary of State of the United States, John C. Whitehead, officially certified, pursuant to 12 U.S.C. § 632 (1982), that Ambassador Sosa "is the sole person having authority to receive, control or dispose of any property held in any ... Federal Reserve bank or insured bank from or for the account of the Republic of Panama or any central bank thereof ... and that his authority with respect to such property is accepted and recognized by me."

On March 3, 1988, we granted a temporary restraining order enjoining the three remaining defendants from debiting any account held in the name of the Republic of Panama unless approved by Ambassador Sosa. The order also enjoined payment on any letters of credit or similar instruments in the name of the Republic of Panama or any of its agencies or instrumentalities.

Irving stipulated with plaintiff not to pay against any account of the Republic of Panama except payments under outstanding letters of credit, and the action against Irving was dismissed. The remaining defendants appeared on March 7, 1988 at the hearing on plaintiff's application for a preliminary injunction. The United States Attorney for the Southern District of New York also appeared and offered the certificate of the Secretary of State to the effect that the United States recognizes the Delvalle government as the lawful government of Panama and Ambassador Sosa as Panama's lawful representative in the United States. Banco Nacional and a representative of the Palma government, claiming a property interest in the funds, sought to intervene as of right.

## DISCUSSION

### I. *Preliminary Injunction*

■ A preliminary injunction may issue upon a showing of (a) irreparable harm and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party seeking the injunction.[3]

### A. Irreparable Harm

■ A showing of irreparable harm is a prerequisite to the issuance of a preliminary injunction.[4] Plaintiff establishes irreparable harm by showing the absence of an adequate remedy at law,[5] and "where money damages is adequate compensation a preliminary injunction will not issue."[6]

■ Here, the remaining defendants argue that injunctive relief is inappropriate because (1) plaintiff alleges mere monetary loss for which it has an adequate remedy at law (money damages), and (2) there has been no showing that defendants are insolvent or otherwise incapable of satisfying a judgment for the approximately $50 million in dispute.

Assuming that plaintiff might recover damages were the banks to disburse funds to anyone other than the lawful representa-

3. *Williams v. Salerno,* 792 F.2d 323, 326 (2d Cir.1986); *KMW Int'l v. Chase Manhattan Bank, N.A.,* 606 F.2d 10, 14 (2d Cir.1979).

4. *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983).

5. *Buffalo Forge Co. v. Ampco–Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir.1981).

6. *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979).

tive of the Republic of Panama, and that the banks might be capable of satisfying a $50 million judgment, we are not persuaded that such a remedy is sufficiently "adequate" to warrant denial of a preliminary injunction. The determination of what is or is not an adequate legal remedy so as to preclude the issuance of an injunction is governed by the circumstances of each particular case,[7] and harm may be irreparable if "of a peculiar nature, so that compensation in money cannot atone for it."[8]

Plaintiff is presently contending with a rival political faction within Panama for control of the government. The United States has recognized plaintiff as the lawfully-constituted Republic of Panama, and that recognition is conclusive and binding upon us.[9] Whichever faction gains control of the disputed funds will have a decisive advantage over the other for effective control of the government. Consequently, the harm imminent here goes beyond mere monetary loss to the very survival of the lawful Delvalle government. Prospective uncertain money damages recoverable upon the remote conclusion of future litigation cannot adequately compensate for the immediate and irreparable loss evident here. In addition, 12 U.S.C. § 632 was enacted "as a practical matter to avoid time-consuming litigation and to give [an] exiled government effective control over [its] funds."[10] Thus, the statute was designed to address situations precisely analogous to that presented here. Finally, there is a real threat that these funds would be dissipated and irretrievably lost if disbursed to persons other than the lawful representative of the Republic of Panama. The existence of such a threat also constitutes irreparable harm sufficient to support a motion for a preliminary injunction.[11]

In light of the above, we conclude that plaintiff has established "irreparable harm," and we now turn to the remaining factors relevant to injunctive relief.

### B. Likelihood of Success on the Merits

■ Our determination that plaintiff will likely succeed on the merits hinges on the political question doctrine applicable to recognition of foreign states and on certain provisions of the Edge Act, 12 U.S.C. § 632.

It is well established that recognition of a foreign state is a political question to be determined solely by the executive branch of government.[12] Judicial deference to the executive in this area accords with the constitutional grant of power over the conduct of foreign relations to the executive branch [13] and with the separation of powers.[14] As a corollary to deferring to the executive branch in determining whom to accredit as representatives of a foreign state, United States courts will not hear suits brought by governments from which official recognition has been withheld.[15]

---

**7.** *Harris Stanley Coal & Land Co. v. Chesapeake & O. Ry.*, 154 F.2d 450, 453 (6th Cir.1946).

**8.** *A.O. Smith Corp. v. F.T.C.*, 530 F.2d 515, 525 (3d Cir.1976).

**9.** *Guaranty Trust Co. v. United States*, 304 U.S. 126, 137–38, 58 S.Ct. 785, 791, 82 L.Ed. 1224 (1938); *American Bell Intern. v. Islamic Republic of Iran*, 474 F.Supp. 420, 423 (S.D.N.Y.1979).

**10.** ALI, *Restatement (Second) of the Law, Foreign Relations of the United States* § 111, Reporters' Notes at 350 (1965).

**11.** *New York Land Co. v. Republic of Philippines*, 634 F.Supp. 279, 288 (S.D.N.Y.), *aff'd*, 806 F.2d 344 (2d Cir.1986).

**12.** *See, e.g., Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410, 84 S.Ct. 923, 930–31, 11 L.Ed.2d 804 (1964); *National City Bank v. Republic of China*, 348 U.S. 356, 358, 75 S.Ct. 423,

425–26, 99 L.Ed. 389 (1955); *Jones v. United States*, 137 U.S. 202, 212, 11 S.Ct. 80, 83–84, 34 L.Ed. 691 (1890).

**13.** U.S. Const. art. II, §§ 2 & 3. *See United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 319–20, 57 S.Ct. 216, 220–21, 81 L.Ed. 255 (1936).

**14.** *See Baker v. Carr*, 369 U.S. 186, 210–13, 82 S.Ct. 691, 706–708, 7 L.Ed.2d 663 (1962); *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 310–311, 62 L.Ed. 726 (1918).

**15.** *See Pfizer Inc. v. India*, 434 U.S. 308, 319–20, 98 S.Ct. 584, 591–92, 54 L.Ed.2d 563 (1978) ("It has long been established that only governments recognized by the United States and at peace with us are entitled to access to our courts, and that it is within the exclusive power of the Executive Branch to determine which nations

When a foreign state's property located in the United States is demanded by two claimants, official recognition of one is conclusive.[16] Precisely this situation was presented in *Bank of China v. Wells Fargo Bank & Union Trust Co.,*[17] where the Nationalist Government of China and the Peoples Republic of China each claimed title to a bank account held in the name of "Bank of China." The court held that when the United States officially recognizes one of the two claimants, "[i]t is not a proper function of a domestic court of the United States to attempt to judge which government best represents the interests of the Chinese State in the Bank of China. In this situation, the Court should justly accept, as the representative of the Chinese State, that government which our executive deems best able to further the mutual interests of China and the United States." [18]

Following *Bank of China,* the executive branch, by recognizing the Delvalle government unequivocally and acknowledging Ambassador Sosa as its diplomatic representative, conclusively determined that only the Delvalle government may claim bank funds held in the name of the Republic of Panama.[19] The United States government explicitly sanctioned Delvalle's claim by certifying Ambassador Sosa and appearing at the hearing to reaffirm that the United States recognizes only the Delvalle government of the Republic of Panama.

Thus, quite apart from the statute, the political question doctrine and its non-recognition corollary would entitle the Delvalle government to claim funds for the Republic of Panama. It is the statute, however, that we deem conclusive in establishing plaintiff's right to immediate injunctive relief.

Section 25(b) of the Edge Act, 12 U.S.C. § 632, provides, in relevant part:

Whenever (1) any insured bank has received any property from or for the account of a foreign state which is recognized by the Government of the United States, or from or for the account of a central bank of any such foreign state, and holds such property in the name of such foreign state or such central bank; (2) a representative of such foreign state who is recognized by the Secretary of State as being the accredited representative of such foreign state to the Government of the United States has certified to the Secretary of State the name of a person as having authority to receive, control, or dispose of such property; and (3) the authority of such person to act with respect to such property is accepted and recognized by the Secretary of State to such insured bank, the payment, transfer, delivery, or other disposal of such property by such bank to or upon the order of such person shall be conclusively presumed to be lawful and shall constitute a complete discharge and release of any liability of such bank for or with respect to such property.

Each of the three statutory requirements has been met here. Defendants are insured banks that have received property

---

are entitled to sue."); *Guaranty Trust Co. v. United States, supra,* 304 U.S. at 137, 58 S.Ct. at 791 ("suit in [a foreign state's] behalf may be maintained in our courts only by that government which has been recognized by the political department of our own government as the authorized government of the foreign state").

16. *See The Rogdai,* 278 F. 294 (N.D.Cal.1920); *The Penza,* 277 F. 91 (E.D.N.Y.1921); *see also Restatement (Second) of Foreign Relations Law* § 311 comment d, illustration 3 (1965). *See generally* Briggs, *Non–Recognition in the Courts: The Ships of the Baltic Republic,* 37 Am.J.Int'l Law 585 (1943) (discussing rival government claims to ships).

17. 104 F.Supp. 59 (N.D.Cal.1952), *modified,* 209 F.2d 467 (9th Cir.1953).

18. 104 F.Supp. at 66.

19. None of the considerations that *Bank of China* posited might prevent recognition from being conclusive apply here. *See id.* at 63–66. The court suggested that when the executive's recognition of a foreign government was equivocal, or when recognition did not imply approval of the transaction, recognition might not be conclusive. Once the executive's position became clear, however, the court agreed that it was bound by the executive's decision. *See id.* at 66. The executive's position in the instant matter is completely unambiguous. The United States stands squarely behind Delvalle's government and its claim to the accounts. *See supra* notes 1 and 2.

for the account of the Republic of Panama or its central bank.[20] Ambassador Sosa, recognized by the Secretary of State as the accredited representative of the Republic of Panama, has certified that he has the authority to receive, control, or dispose of such property. Finally, the authority of Ambassador Sosa has been accepted, recognized and certified by the Secretary of State.

The plain language of the statute provides that when these conditions are met, delivery of funds "shall be conclusively presumed lawful." This statutory presumption assures the likelihood that plaintiff will succeed on the merits.

Consideration of the alternative grounds for relief—sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in plaintiff's favor—leads to the same result. Certification constitutes a complete discharge and release of *any* liability of the banks. By law, the defendants will suffer no harm from following only Ambassador Sosa's directions.

The legislative history of the statute further demonstrates the necessity of granting injunctive relief. The statute was adopted to enable the State Department to provide recognized foreign governments with swift access to their funds and property that might otherwise be tied up in litigation by rivals claiming to represent the foreign government. As reported by the House Committee on Banking and Currency, litigation would provide an inadequate solution:

> The Federal Reserve banks hold large sums on deposit and large amounts of gold under earmark for foreign governments and foreign central banks. Some of these governments are at war, some of their countries have been invaded, and some of them are completely occupied by invaders. In such circumstances, disputes may arise as to who has authority to withdraw or otherwise deal with such deposits or such earmarked gold; and the Federal Reserve banks may find themselves confronted with situations in which they must either make payments or deliveries at their peril or refuse to make payments or deliveries until the disputes can be settled by litigation or otherwise. A resort to the latter alternative might make funds which friendly governments need for essential purposes unavailable until the termination of long drawn out litigation, and this might result in embarrassment to the relations of this Government with such foreign governments.[21]

The debate over the bill in the Senate also indicates that the statute was intended to avoid extended litigation under the common law political question doctrine.[22] Attorney General Francis Biddle's contemporaneous exposition of the "statutory scheme and purpose" further supports this view:

> Prior to the enactment of the statute, foreign governments of various countries found it difficult in many cases, because of conditions arising out of the war, to deal with property held by banks in this country for their account. Some of these countries were at war; others had been invaded; still others had been completely occupied by enemy forces. Disputes had arisen as to the representatives authorized to deal with the property. Under these circumstances the banks concerned either had to make payments at their peril or to refuse payment until these disputes were settled by litigation or otherwise. These circumstances made it difficult for friendly foreign governments to secure adequate banking facilities and service in this country and gave rise to

---

**20.** Some of the accounts are in the name of Banco Nacional which we find to be a central bank as that term is used in § 632. *See infra.*

**21.** H.R.Rep. No. 349, 77th Cong., 1st Sess. at 1 (1941). *See also* S.Rep. No. 133, 77th Cong., 1st Sess. at 1–2 (1941).

**22.** *See* 87 Cong.Rec. 2617–23 (1941); *see also* 86 Cong.Rec. 13277–84 (1940) (debate on predeces-

sor to § 632). As discussed in the debates, the chief advantage of codifying the non-recognition doctrine was that it would avoid the necessity for a lengthy court inquiry into which government representative the United States recognized. Instead, the Secretary of State could conclusively determine the authorized representative. *See* 87 Cong.Rec. 2620 (1941) (remarks of Sen. Brown).

embarrassments between these governments and our own. The purpose of the statute was to provide a practical method whereby the Secretary of State, in the exercise of his discretion, might deal with this problem.[23]

In sum, the certification provision was intended to implement the existing power of the executive to determine which foreign government would be recognized so that the recognized government representative could take possession of the property without delay.

■ Our role then is limited to determining whether the procedure has been followed. Once it has been established that the procedure has been followed, as here, we must expeditiously award the disputed property to the certified representative. Accordingly, we grant plaintiff's motion for a preliminary injunction.

C. Bond

■ We find that no security should be required for this injunction. The relevant statute, 12 U.S.C. § 632, effectively protects the banks from other claims against these Republic of Panama accounts. Requiring a bond would thwart the purpose of § 632 by qualifying plaintiff's claim to funds which it has an unqualified right to possess.

II. *Intervention*

■ Our grant of a preliminary injunction essentially disposes of the intervenors' claims. Intervenors, purporting to represent the Republic of Panama in the name of Minister Palma, cannot be heard. The executive's refusal to recognize the Palma government deprives it of standing.[24] The Palma government has no cognizable interest to assert in this litigation, and, accordingly, its motion to intervene is denied.

■ Banco Nacional's argument for intervention is somewhat more tenable. Banco Nacional contends that it is not a central bank, that Banco Nacional funds frozen by the temporary restraining order are for the accounts of private individuals rather than the government, and, therefore, that Banco Nacional should be permitted to intervene in order to protect the interest of its individual depositors. Because we find that Banco Nacional falls within the definition of "central bank" in 12 U.S.C. § 632, we conclude that the political question doctrine and § 632 bar Banco Nacional's motion.

Section 632 broadly, albeit somewhat circularly, defines "central bank" to include "any foreign bank or banker authorized to perform any one or more of the functions of a central bank." "Functions of a central bank" were equated with governmental fiscal functions in *Bank of China v. Wells Fargo Bank & Union Trust Co., supra.*[25] The court found that Bank of China was authorized to perform certain governmental fiscal functions and therefore was a central bank.

Banco Nacional meets the criteria formulated in *Bank of China* for identifying a central bank. It is authorized to (1) issue, redeem, and pay interest on government bonds in foreign markets;[26] (2) handle, collect, and pay governmental funds deposited abroad;[27] (3) promote and foster trade abroad;[28] and (4) handle a portion of the domestic deposits of governmental funds.[29] Any one of these functions would suffice to classify Banco Nacional as a central bank under *Bank of China.* Other indicia of Banco Nacional's status as a central bank include its designation as the "primary financial organization of the State;"[30] the State's financial responsibility for all of Banco Nacional's obligations;[31] its exemp-

**23.** 40 Op.Att'y Gen. 400, 402 (1945).

**24.** *See supra* note 6.

**25.** 209 F.2d at 473–74.

**26.** *See* Law No. 20, April 22, 1975 (reorganizing Banco Nacional), art. 1, 26(n), and 33.

**27.** *See id.* art. 1, 13(c), and 26(n).

**28.** *See id.* art. 1, 13(c).

**29.** *See id.* art. 8.

**30.** *Id.* art. 1.

**31.** *Id.* art. 3.

tion from all taxes and its enjoyment of "all privileges that procedural laws grant to the State;"[32] its regulation of the exchange and clearing house activities of the national banking system;[33] the appointment of all of its directors by the executive branch;[34] and the power of the executive branch to remove Banco Nacional's General Manager.[35]

The foregoing convinces us that Banco Nacional is authorized to perform functions of a central bank and is, therefore, subject to § 632.

The Acting Secretary of State's certification of Ambassador Sosa's claim sets this case apart from the cases relied upon by Banco Nacional. *Transportes Aereos de Angola v. Ronair, Inc.*[36] permitted an entity of the unrecognized government of Angola to bring suit on a commercial transaction only because of the unique fact that the State Department expressly asserted that allowing the suit was consistent with the foreign policy of the United States. If the government's position had been otherwise, the court left little doubt that it would have barred the plaintiff's claim.[37] Similarly, *Federal Republic of Germany v. Elicofon*[38] suggested that an exception to the rule denying standing to unrecognized governments and their entities might apply when an act of the executive sanctioned the suit.[39] Again, the exception clearly does not apply here.

Accordingly, we find that the motion of Banco Nacional to intervene must be denied.

## CONCLUSION

Accordingly, plaintiff's motion for a preliminary injunction is granted in all respects. The temporary restraining order is to remain in full force and effect pending filing of a preliminary injunction to be set-tled upon notice within five (5) days. Motions to intervene as of right by Banco Nacional and the Palma government are denied in all respects.

The foregoing opinion constitutes our findings of fact and conclusions of law, in accordance with Rule 52(a), Fed.R.Civ.P.

**32.** *Id.* art. 6.

**33.** *Id.* art. 10.

**34.** *Id.* art. 11.

**35.** *Id.* art. 17.

**36.** 544 F.Supp. 858 (D.Del.1982).

**37.** *Id.* at 862–63.

**38.** 358 F.Supp. 747 (E.D.N.Y.1970), *aff'd,* 478 F.2d 231 (2d Cir.1971), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1443, 39 L.Ed.2d 489 (1974).

**39.** 358 F.Supp. at 752 n. 4.