**FEDERAL REPUBLIC OF GERMANY,**
**Plaintiff,**

v.

**Edward I. ELICOFON, Defendant,**

**Elisabeth Mathilde Isidore Erbgrossherzogin von Sachsen–Weimar–Eisenach (Grand Duchess of Saxony–Weimar), Plaintiff-Intervenor.**

**KUNSTSAMMLUNGEN zu WEIMAR,**
**Plaintiff,**

v.

**Edward I. ELICOFON, Defendant.**

**Nos. 69–C–93, 69–C–370.**

United States District Court,
E. D. New York.

June 25, 1970.

Supplemental Opinion Sept. 25, 1972.

Albert D. Jordan, Valicenti, Leighton, Reid & Pine, New York City, Counsel to Horst Kurnik, for Federal Republic of Germany.

Richard W. Hulbert, and George J. Grumbach, Jr., Cleary, Cottlieb, Steen & Hamilton, New York City, for Edward I. Elicofon.

Herbert J. Strong, Scribner & Miller, New York City, for Elisabeth Mathilde Isidore, etc.

Harry I. Rand, Botein, Hays, Sklar & Herzberg, New York City, for Kunst-sammlungen zu Weimar.

James D. Porter, Asst. U. S. Atty., Robert A. Morse, U. S. Atty., E. D. New York, Brooklyn, N. Y., for the United States.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, Chief Judge.

On January 27, 1969, the Federal Republic of Germany began action number 69–C–93 against Edward I. Elicofon for the return of two paintings believed to be in defendant's possession. The paint-

ings, portraits of Hans and Felicitas Teicher, were allegedly painted by the celebrated German artist Albrecht Duerer in or about 1499. The complaint asserts that the paintings became part of an art collection in Weimar in 1824 and were placed in a museum which since 1921 has been called "Staatliche Kunstsammlungen"; that during the occupation of Weimar (currently in East Germany) by the United States armed forces and prior to July 1, 1945, the paintings were stolen from the Castle Schwartzburg, where they had been placed for safekeeping; and that defendant, directly or indirectly, acquired the paintings from the thief.

Plaintiff claims the right to custody and possession of the paintings by reason of the Joint Declaration of Three Allied Powers of September 18, 1950, which, with the United States as a participant, declared that the Federal Republic is the only government which may represent the German people.[1]

Defendant denies the allegations of the complaint, including the theft, and affirmatively claims title to the paintings through purchase in good faith for value in accordance with the laws of Germany.[2]

By order dated March 25, 1969, Elisabeth Mathilde Isidore Erbgrossherzogin Von Sachsen-Weimar-Eisenach (hereinafter the Grand Duchess) was granted leave to intervene. She alleged that the paintings have been part of the Grand Ducal collection since 1824 and asserts title to the paintings through assignment from the Grand Duke of Saxony-Weimar on August 8, 1968.

On April 14, 1969, the Kunstsammlungen Zu Weimar (hereinafter Weimar Art Collection), an entity existing under the laws of the German Democratic Republic (hereinafter G.D.R.) and having custody over the art collection from which the paintings in suit were allegedly stolen, both moved to intervene in 69–C–93, Fed.Rules Civ.Proc. 24(a)(2), and brought a separate action, 69–C–370, against Edward I. Elicofon for return of the paintings. The Weimar Art Collection alleges that it owned the paintings at the time of the theft.

The Federal Republic, the Grand Duchess, and Elicofon all oppose the Weimar Art Collection's application to intervene. Elicofon has, in addition, moved to dismiss the Weimar Art Collection's complaint in 69–C–370. Should his motion to dismiss be denied, however, Elicofon asks that 69–C–93 and 69–C–370 be consolidated.

The motions by the Weimar Art Collection to intervene in 69–C–93 and by Elicofon to dismiss the complaint in 69–C–370 or if that is unsuccessful to consolidate 69–C–93 and 69–C–370 are currently before the court.

The Federal Republic takes the position, shared by the Grand Duchess and Elicofon, that the Weimar Art Collection is an instrumentality of the G.D.R., a government not recognized by the government of the United States, and as such lacks standing to sue in United States courts. The Federal Republic makes the additional argument that it adequately represents the interests of the Weimar Art Collection in 69–C–93. In further support of his motion to dismiss the complaint in 69–C–370, Elicofon asserts that as a citizen of a country whose government is not recognized by the United States, the Weimar Art Collection is not a citizen or subject of a foreign state within the meaning of 28 U.S.C. § 1332(a)(2) and, therefore, that the court lacks jurisdiction over the subject matter of the action.

The Weimar Art Collection differs with the assertions of the other parties

---

1. Paragraph 9 of the complaint alleges:

"At the time of their theft, the Duerer Paintings were the property of the Weimar Musuem which, in turn, belonged to the State of Thuringia, one of the Federal States of the German Reich, of which plaintiff is the only lawful and recognized successor."

2. Other affirmative defenses not relevant to the issues before the court are asserted.

concerning its status. It alleges that by virtue of a decree of the Minister of Culture of the G.D.R. dated April 14, 1969 and made retroactive to January 1, 1969 it is a juristic entity independent of the government and possesses the capacity "to enter into contracts, to acquire and dispose of property and to sue in its own name." *Affidavit of Manfred Hofmann,* at par. 10. The Weimar Art Collection argues, therefore, that it has standing to bring suit in this court regardless of the position which this court may take on the question of whether the G.D.R. itself could sue.

The parties have filed numerous and voluminous affidavits and memoranda in support of their various positions. In addition, the United States Department of Justice, acting on behalf of the Department of State, filed the following "Suggestion of Interest of the United States":

1. The United States Government does not recognize the East German regime.

2. The United States Government recognizes the Federal Republic of Germany as the only German Government entitled to speak for Germany as the representative of the German people in international affairs.

3. The United States Government recognizes the Federal Republic of Germany as entitled in this litigation to represent the Weimar Museum as trustee of its interests.

It is apparent that notwithstanding the position of the Weimar Art Collection, the question of whether a government not recognized by the United States would have standing to bring an action like the one at bar is of central importance to the resolution of the motions before the court. It is conceded by the parties that a determination favorable to the unrecognized government would establish the standing of the Weimar Art Collection in this litigation without regard to its claim of independence of the government of the G.D.R.

*Survey of the Case Law*

Virtually all of the courts which have had occasion to comment on the standing of unrecognized governments to sue in American courts have stated quite flatly that such governments lack standing to sue. See S. Lubman, The Unrecognized Government in American Courts: Upright v. Mercury Business Machines, 62 Colum.L.Rev. 275 (1962). Two grounds have been offered in support of this conclusion. At least one court has reasoned that the right of foreign governments to sue in American Courts is a function of the comity which exists between friendly nations and that this comity is absent between the United States and a government not recognized by it. Russian Socialist Federated Soviet Republic v. Cibrario, 235 N.Y. 255, 139 N.E. 259 (1923). The great majority of the courts which have taken a position on the issue have based their opposition to suits by unrecognized governments on the theory that to allow an unrecognized government to sue in American courts would overrule the act of the President in withholding recognition from the plaintiff government, a power which is exclusively his under the Constitution. *See e. g.* The Penza, 277 F. 91 (E.D.N. Y.1921); The Rogdai, 278 F. 294 (N.D. Cal.1920).

Absent from most of these cases is a thorough analysis of the considerations which have motivated this rather consistent expression of judicial opinion. The correctness of the rule denying litigant status to non-recognized governments seems to have been taken for granted in many cases, and little attempt has been made to examine the nature of the presidential act of refusing to recognize a government. Some courts, moreover, have repeated the rule while reaching results which seem to question its validity. In Wulfsohn v. Russian Socialist Federated Soviet Republic, 234 N.Y. 372, 138 N.E. 24 (1923), appeal dismissed, 266 U.S. 580, 45 S.Ct. 89, 69 L.Ed. 451 (1924), the same court which some months later de-

cided the now famous *Cibrario* case upheld the claim of Soviet Russia, at that time not recognized by the United States, to sovereign immunity from suit. The court stated that the existence of a government is a fact not dependent upon recognition and that a foreign sovereign cannot be made subject to our laws without its consent.[3] *Cf.* Bank of China v. Wells Fargo Bank & Union Trust Co., 92 F.Supp. 920 (N.D.Cal.1950), appeal dismissed, 190 F.2d 1010 (9th Cir. 1951), judgment entered, 104 F.Supp. 59, 66 (N.D.Cal.1952), modified, 209 F. 2d 467 (9th Cir. 1953); Banque de France v. Equitable Trust Co., 33 F.2d 202 (S.D.N.Y.1929), aff'd, 60 F.2d 703 (2d Cir. 1932); Russian Reinsurance Co. v. Stoddard, 240 N.Y. 149, 147 N.E. 703 (1925). And in United States v. Home Insurance Co., 89 U.S. (22 Wall.) 99, 22 L.Ed. 816 (1875) and Amtorg Trading Corp. v. United States, 71 F.2d 524 (C.C.P.A.1934), federal courts permitted suit by corporations associated with unrecognized governments. *See also* Upright v. Mercury Business Machines Co., 13 A.D.2d 36, 213 N.Y.S.2d 417 (1st Dep't 1961) (dictum). In *Home Insurance, supra,* the Supreme Court sustained the standing to sue of two corporations created by the Georgia legislature at a time when Georgia was in armed rebellion against the Union. The court reasoned that the Georgia legislature had a de facto if not a de jure existence and that enactments of the legislature which were neither hostile to the Union nor in conflict with the Constitution of the United States had the same validity as if they had been enactments of legitimate legislatures. In *Amtorg, supra,* the Court of Customs and Patent Appeals allowed a New York corporation which was wholly owned by Soviet Russia to challenge an import

duty. The court based its decision on the New York citizenship of the plaintiff corporation and indicated that since its equity jurisdiction was not invoked and no matter of public policy was involved the court would not pierce the corporate veil.

### The Sabbatino Case

It is against this background that this court interprets a recent Supreme Court decision as having invited a reexamination of the rule denying unrecognized governments access to our courts. In Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), the Supreme Court was faced with the question of whether the government of Cuba, a government recognized by but having no formal diplomatic relations with the United States, could sue in United States courts. In upholding the status of the Cuban government as a litigant, the Court commented:

> The doctrine that nonrecognition precludes suit by the foreign government in every circumstance has been the subject of discussion and criticism . . . . In this litigation we need intimate no view on the possibility of access by an unrecognized government to United States courts, except to point out that even the most inhospitable attitude on the matter does not dictate denial of standing here. 376 U.S. at 411, n. 12, 84 S.Ct. at 931, n. 12.

The Court, moreover, illuminated a path for the reexamination of the rule to follow. The Court said at pp. 410–411, 84 S.Ct. at 931:

> It is perhaps true that nonrecognition of a government in certain circumstances may reflect no greater un-

---

3. In Russian Socialist Federated Soviet Republic v. Cibrario, *supra*, the New York Court of Appeals elaborated somewhat on its decision in *Wulfsohn*:
   Nor is anything here decided inconsistent with Wulfsohn v. Soviet Republic (*supra*). Upon the facts in that case, if the defendant was not an existing

government, it might not be sued. There was no party before the court. If it were, as alleged and admitted, the same result followed not because of comity, but because an independent government is not answerable for its acts to our courts. 235 N.Y. at 263, 139 N.E. at 262.

friendliness than the severance of diplomatic relations with a recognized government, but the refusal to recognize has a unique legal aspect. It signifies this country's unwillingness to acknowledge that the government in question speaks as the sovereign authority for the territory it purports to control. . . . Political recognition is exclusively a function of the Executive. The possible incongruity of judicial "recognition," by permitting suit, of a government not recognized by the Executive is completely absent when merely diplomatic relations are broken.

### Analysis in Light of the Sabbatino Case

■ The Supreme Court's elucidation of the presidential act of nonrecognition as manifesting the unwillingness of the United States to acknowledge that a government speaks as the sovereign authority for the territory it purports to control is productive of a rule which would deny to the G.D.R. the right to bring suit in our courts in an action like the one at bar. Nonrecognition of a government, under the Supreme Court's analysis, is indicative of the refusal of the United States to regard that government as the legitimate spokesman in international affairs for the people it purports to govern. Nonrecognition, therefore, negatives the very posture which the G.D.R. would necessarily have to assume had it brought suit for return of the paintings. A claim of title to the paintings by the G.D.R. would, by definition, be a claim on behalf of the people it purports to govern.

■ Any attempt, moreover, to characterize such a suit as involving purely private rights and therefore outside the realm of international affairs unduly limits the scope of international affairs. It is a mistake to restrict the label of international affairs to negotiations between governments concerning subjects in the nature of national defense and foreign cultural exchanges. A government is in every sense of the word acting in international affairs when it seeks the aid of a foreign government in an attempt to vindicate the private rights of specific citizens or of its citizenry as a whole. See Agreement with Yugoslavia on Claims of United States Nationals, [1965] 1 U.S.T. 1; Banco Nacional de Cuba v. Sabbatino, supra, at 431–432, 84 S.Ct. at 942. A decision by this court permitting the G.D.R. to bring such a suit would be the equivalent of an assertion by the court that it acknowledges the right of that government to represent the people of East Germany in international affairs. A determination of that kind would be inconsistent with the presidential denial of recognition to the G.D.R. and thus be an unconstitutional encroachment upon the power of the President.[4]

It is clear, at this point, that the question of whether the Weimar Art Collection has standing to maintain suit in this court for return of the Duerer paintings cannot be answered without a prior determination of the relationship of the Collection to the G.D.R. The Weimar Art Collection has consistently maintained that it is a juristic entity independent of the government and has supported its contentions with voluminous affidavits. The other parties to the action have just as consistently and with similar supporting papers taken a contrary position. The court is reluc-

---

4. It is unclear whether this reasoning supports a rule invariably denying standing to unrecognized governments. There may be special circumstances in which action by the President can be interpreted as creating an exception to the rule. For example, it may be argued that the act of the Executive in permitting American nationals to engage in commercial transactions with unrecognized governments or their instrumentalities carries with it a grant to those governments or instrumentalities of standing to litigate claims arising out of those transactions in United States courts. See Upright v. Mercury Business Machines Co., supra; S. Lubman, The Unrecognized Government in American Courts: Upright v. Mercury Business Machines, supra.

tant, however, to decide the complex issues of law and fact involved in this critically important question on the un-cross-examined assertions of even the distinguished experts marshalled by the various parties. A hearing on these issues is required if the court is to avoid a determination based upon politically informed notions concerning property rights in the G.D.R.

If, after a hearing, it is found that the Weimar Art Collection is an arm or instrumentality of the G.D.R., the court will have no choice but to hold that it too is barred from bringing suit. On the other hand, facts may be developed at the hearing which indicate that the Weimar Art Collection is sufficiently independent of the G.D.R. to be entitled to be free of the latter's disability.

The parties are therefore directed to appear by their attorneys on July 2, 1970 at 11:30 A.M. to set a date for a hearing and to specify the issues of law and fact to be heard.

The Court also reserves decision on Elicofon's claim that the court lacks subject matter jurisdiction in 69–C–370 and on the Federal Republic's contention that it adequately represents the interests of the Weimar Art Collection in 69–C–93.

It is so ordered.

### SUPPLEMENTAL OPINION

The memorandum of decision of this court dated June 25, 1970 directed an evidentiary hearing to determine whether the Weimar Art Collection is an arm or instrumentality of the GDR. The resolution of the issue is determinative of the motion of the Weimar Art Collection to intervene in 69–C–93 and of the defendant Elicofon's motion to dismiss the complaint in 69–C–370. The Weimar Art Collection submitted the affidavits of Manfred Hofmann and Heinz Puschel in support of its motion to intervene and in opposition to the motion to dismiss its complaint. The affidavits

of Andreas F. Lowenfeld were submitted for Elicofon and Federal Republic of Germany. Subsequent to the filing of the memorandum of decision the Weimar Art Collection deposed Dr. Walther Scheidig, the former director of the Weimar Art Collection, Dr. Gerhard Pommeranz-Liedtke, the present director, Dr. Bernard Graefrath and Dr. Heinz Puschel.[1] The other parties were afforded full right of cross-examination. The testimony of Dr. Sigfried Mampel was offered at an evidentiary hearing before the court by the Federal Republic of Germany. The Federal Republic of Germany commenced this action (69–C–93) on January 27, 1969.

On April 14, 1969, the Minister for Culture and Education of the GDR issued an order granting the Weimar Art Collection "the status of a juristic person" and declaring "it shall be represented in legal matters through the Director of the Weimar Art Collections." It further directed:

"The Statut (articles or by-laws) of the Weimar Art Collections is to be prepared by the Director and requires confirmation by the competent local governmental authorities."

The order was made retroactive by its terms to January 1, 1969. The statut was signed by the Director on April 16, 1969 and confirmed by the Lord Mayor of the City of Weimar on April 17, 1969. A copy of the statut is appended to this memorandum of decision.

Prior to World War I, Weimar Castle, which included the Weimar Art Collection, was the property of the Grand Duke Wilhelm Ernst of Saxony. On April 30, 1920, Federal German law created various states. One of the states, Land Thüringen, comprised seven political subdivisions, including the territory of Weimar, in which the museum was located. Land Thüringen succeeded to the rights formerly held by the territory of Weimar which included the museum and

---

1. The State Department denied applications for visas for the purpose of entering the country to testify. Thereupon the parties agreed to depositions of these witnesses.

the castle in which the museum was located. During the reign of the Third Reich the German Reichstag enacted a law providing for the transfer of the sovereign rights of the various states to the Central Government, the German Reich. The Weimar Art Collection was then known as the Staatliche Kunstsammlungen zu Weimar ("Governmental Art Collections in Weimar").

After the defeat of Germany in World War II, on June 5, 1945 the four powers, i. e., the United States of America, the United Kingdom, the USSR and the French Republic entered into an agreement assuming all the powers possessed by the German Government and any state, municipal, or local government, or authority within Germany. The United States armed forces withdrew from Weimar on or about July 1, 1945, when the USSR became the occupying power. The Soviet Military Administration issued orders giving possession of sequestered assets to the Länder or States within the Soviet zone. On October 7, 1949, the USSR proclaimed the establishment of the German Democratic Republic in the zone occupied by the USSR. Länder were dissolved as political units by the Volkskammer (People's Chamber of the GDR) in 1952 and were formally eliminated by a law enacted in 1958. The Weimar Art Collection under the name Staatliche Kunstsammlungen zu Weimar until 1966 and thereafter under the name Kunstsammlungen zu Weimar, until the issuance of the order of the Minister for Culture and Education was the property of the GDR and under the direct control of the Minister of Culture and Education.

The Director of the Weimar Art Collection appears to have broad administrative powers over the museum. The statut recited that he " . . . is empowered to make decisions, on his own responsibility . . ." and ". . . to conclude . . . agreements, to acquire, administer, utilize and also dispose of the property" of the institution. The Director is appointed by the Mayor of the City of Weimar and subject to dismissal by him. The City of Weimar has limited power to deal with local problems, i. e., parks, streets, garbage disposal. It is subject to control by the Bezirke of Erfurt which in turn is responsible to the central government.[2]

The concept of a single government with levels of authority reaching into every locality through all areas of social, economic and political life is one of the basic tenets of the GDR. The principle of political homogeneity is incorporated in the GDR Constitution of 1968. The Volkskammer or "People's Chamber" is the source of power in the German Democratic Republic.[3] The local representative bodies are organs of the Volkskammer[4] as are enterprises such as the Weimar Art Collection.[5]

2. The law enacted on July 29, 1952 in the Volkskammer eliminated "länder" and substituted fourteen districts or counties called Bezirke. The law states in part: " * * * The effective guidance and control of the lower [State] instrumentalities by the higher ones * * * must be assured.

Sec. 1(1) The Laender shall reconstruct their territories into Districts.

(2) The demarcation of the Districts shall be arranged in such a way that it is adequate to the economic necessities and that the execution of all State tasks especially the effective guidance and control of the State instrumentalities in the communities is assured.

3. ARTICLE 48 of the Constitution states in part:

(1) The People's Chamber is the supreme organ of state power in the German Democratic Republic. It decides in its plenary sessions the basic questions of state policy.

4. ARTICLE 81 of the Constitution states in part:

(1) The local popular representative bodies are the organs of state power in the districts, regions, towns, municipal boroughs, local communities and associations of local communities, elected by citizens having the right to vote.

5. ARTICLE 41 of the Constitution states:

The socialist enterprises, towns, local communities and associations of local communities are, within the framework of central state planning and management, self-responsible communities in which

Though the Constitution Article 81(2) places responsibility for local decisions on local officials,[6] it also requires an accounting to the central state power for all official actions taken.[7] The stringent controls over the affairs of the museum is exercised through the Minister of Culture appointed by the Volkskammer (Article 80). The Minister of Culture has the right to overrule the decisions of the Director of the Museum (see Statut of the Ministry of Culture), and indeed has the power to dissolve the museum by decree. The Weimar Art Collection is financed from funds granted the City of Weimar from the Bezirke (County) of Erfurt which in turn receives its funds from the central government and depends entirely on the largess of the City of Weimar in this distribution of the state budget.[8]

Evidence was offered through Dr. Pommeranz-Liedtke that the title to the real estate and buildings occupied by Weimar Art Collection was conveyed from Land Thüringia to the City of Weimar on November 11, 1961 and in turn conveyed to the Weimar Art Collection on August 15, 1969.[9] The ownership of the real and personal property is related to the Statut of the Weimar Art Collection. The instrument purporting to convey title was a transfer of the "Bearer of Right Status." The certificate stated in part:

"The change of Bearer of Right Status is made based on the Order of the Ministry for Culture about the social organizations of the working people.

citizens work and shape their social relations. They safeguard the basic rights of citizens, the effective linking of individual and social interest, and a multifole social-political and cultural-intellectual life. They are protected by the Constitution. Interference with their rights is permissible only on the basis of law.

The Official Explanation of Article 41 is the following:

"Article 41 presumes a necessary coordination of central state planning and direction with the initiative of the workers who cooperate in these local communities. . . . Only the state as instrument of the worker's class and its associates can guarantee the realization of the social conditions, the central structure and the coordination of the economy with other social areas such science, education, and culture through decisions binding on everyone and everyone's actions. In the system of socialism, central state planning and direction are organically linked with the self-responsibility of the communities, in accordance with the principles of democratic centralism."

6. ARTICLE 81 of the Constitution states in part:

(2) The local popular representative bodies decide, on the basis of law and on their own responsibility, on all matters which concern their area and its citizens. They organize popular cooperation in the shaping of political, economic, cultural and social life, and cooperate with the

7. The responsibility of all leading employees in the state and economy towards citizens is guaranteed by a system of reporting back.

The Official Explanation of Article 88 is the following:

"At the same time, the principle of democratic centralism in the composition and structure of leadership of state and economy entails the duty in each instance to render account to the immediately superior organ, *all the way up to the central state organs*, which, in turn, must render account to the highest representative body, the Volkskammer. The control over implementation and the ensuing duty to render account of the execution of delegated tasks is an essential part of the actual governing of the socialist state."

8. The Law concerning the state budget of the German Democratic Republic (December 16, 1968) declared that the central budget was "organically integrated with the district and city budgets."

9. The court does not decide the question of the validity of these conveyances. It is noted, however, that Bezirke replaced Länder in 1952 and the form of Land as a political subdivision was eliminated in 1958. There is also a serious question as to whether Land Thüringia had title on the date of the alleged conveyance. The claim of title in any Länder or states is based on an order issued by the Soviet Military Administration during the Soviet occupation on October 24, 1945.

Art Collections in Weimar of 4/14/69 (Legal Gazette II, # 31 p. 218 and on the Statutes of the Art Collections in Weimar approved by the Lord Mayor of Weimar dated 4/16/69."

(The correct date would be 4/17/69)

The property held by the museum is described as people's property. People's property is "nationally owned property of society as a whole" as defined in Article 10.[10] The museum cannot hold this property against the claim of people's property but only as its trustee.

The ownership of the paintings and works of art by the museum and its role as "bearer of rights" demonstrates the museum's role as an integral part of the central government rather than its independence from it.

■ I find that the Weimar Art Collection was, prior to the April 14, 1969 order of the Minister for Culture and Education, performing a governmental function as an arm and agency of the GDR. It was required to conform its educational and cultural activities to policies dictated by the Volkskammer through the Minister for Culture and Education. The GDR exercised complete control over the museum's finances and personnel. The grant of a juristic person status to the museum by the order of April 14, 1969 in no way altered the relationship between the museum and the GDR. The Weimar Art Collection continued after the order as before the order to be under the complete domination and control of the GDR. Its continued existence depends on the whim of the Volkskammer.

■ I further find that the order granting the Weimar Art Collection a juristic personality was designed by the GDR to avoid the obstacle erected against a non-recognized power for the purpose of this litigation. The acts of an unrecognized power are normally given effect where it pertains to rights within its own borders. We are not obliged to give effect to acts of non-recognized powers that grant rights here in derogation of the authority of the President of the United States in foreign affairs. Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 433 F.2d 686, 699 (2d Cir. 1970).

■ The Weimar Art Collection argues that even if it is an arm or instrumentality of the GDR, it is still entitled to sue in our courts under Article XII of the Treaty with Germany of Friendship, Commerce and Consular Rights of December 8, 1923, 44 Stat. 2132 (1927), T.S.No. 725, which provides, in pertinent part, as follows:

Limited liability and other corporations and associations, whether or not for pecuniary profit, which have been or may hereafter be organized in accordance with and under the laws, National, State or Provincial of either High Contracting Party and maintain a central office within the territories thereof, shall have their juridical status recognized by the other High Contracting Party provided that they pursue no aims within its territories contrary to its laws. They shall enjoy free access to the courts of law and equity, on conforming to the laws regulating the matter, as well for the prosecution as for the defense of rights in all the degrees of jurisdiction established by law.

The Weimar Art Collection contends that the 1923 treaty is still applicable to East Germany and that the Weimar Art Collection, as a "juristic person," under East German law, is entitled to "free access" to our courts.

10. Article 10 of the Constitution defines three classes of "socialist property" as follows:
(1) Socialist property exists in the following forms:
as nationally owned property of society as a whole, as joint cooperative property of collectives of working people, and as the property of social organizations of citizens.

The decisions of the Supreme Court in Clark v. Allen, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947), and Zschernig v. Miller, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968), do not support the Weimar Art Collection's argument. The Court in *Clark* stated that while the events surrounding World War II did not necessarily suspend or abrogate the 1923 treaty, "the Chief Executive or the Congress may have formulated a national policy quite inconsistent with enforcement of a treaty in whole or in part," Clark v. Allen, *supra* at 508–509, 67 S. Ct. at 1435. The Court in *Clark* found that the national policy, as expressed in the Trading with the Enemy Act, was not incompatible with the right of inheritance granted under Article IV of the treaty. *Zschernig* arose after the division of Germany was crystallized. While in a concurring opinion Justice Harlan expressed his belief that the treaty still applied to East Germany, the majority of the Court did not choose to rule on the continued validity of the treaty, but rather invalidated an Oregon escheat statute on the constitutional grounds of state intrusion into the federal domain of foreign affairs.

It is not necessary for this court to rule on the validity of the treaty as a whole in this case.[11] Even if the treaty as a whole applies to East Germany, the more important factor here is that the United States does not recognize the GDR as the government of East Germany. Furthermore, the Department of State has expressed its view that "Article XII of the 1923 Treaty does not require that the privilege of bringing suit be accorded to the East German regime or an agency or instrumentality of that regime, regardless of the juridical form which such agency or instrumentality may have under the laws of the East German regime." Letter from Carl F. Salans, Acting Legal Adviser, Department of State, to Harlington Wood, Jr., Assistant Attorney General, July 31, 1972, Appendix A to Memorandum on behalf of the United States. Thus, to enforce Article XII of the treaty would be highly inconsistent with expressly formulated national policy. To allow the Weimar Art Collection to intervene in this case would render our Government's non-recognition of the GDR a meaningless gesture. Such a holding would permit non-recognized governments to use our courts at will by creating "juridical entities" whenever the need arises. The Supreme Court in *Clark, supra* at 508–510, 67 S.Ct. 1431, clearly indicated that our courts should not enforce treaty provisions where to do so would defeat our Government's foreign policy objectives. I hold that Article XII of the 1923 treaty does not grant the Weimar Art Collection standing to intervene or sue in our courts.

The parties are directed to appear on the 29th day of September 1972, in courtroom No. 5, 10 A.M., to discuss the custody of the subject matter of the action pending a final determination of the issues. The parties shall not enter into any agreement affecting the custody of the paintings without approval of the court.

Motion by the Weimar Art Collection to intervene in 69–C–93 is denied. It is

So ordered.

The motion of the defendant Elicofon to dismiss the complaint in 69–C–370 is granted. The Clerk of the Court is directed to enter judgment in favor of the defendant Elicofon and against the plaintiff Kunstsammlungen zu Weimar dismissing the complaint.

### STATUT
### of the Weimar Art Collection

#### § 1

#### Legal Status and Seat

(1) The Weimar Art Collection is a juristic entity. Its domicile is Weimar.

---

11. The United States, which has filed a suggestion of interest and memoranda opposing intervention by the Weimar Art Collection, considers that the 1923 treaty still applies to the area of East Germany.

(2) The Weimar Art Collection is subject to supervision by the Council of the City of Weimar.

## § 2

### Tasks and Activities

(1) The Weimar Art Collection constitutes places of education and research in the sphere of science and arts. It preserves and cares for the works of architecture, painting, graphics, sculpture and arts and crafts of which it is in charge.

(2) In particular it is the responsibility of the Weimar Art Collection,

(a) to take expert care of the works of art,

(b) to take all measures for their preservation and care, their expert restoration and preservation in accordance with the latest scientific methods,

(c) to carry out scientific research and educational work, above all through exhibitions, through the issuance of scientific publications and catalogues, through conducted tours and lectures,

(d) to organize visitor publicity in co-operation with mass organizations and enterprises.

ENGLISH TRANSLATION

## § 3

### Administration

(1) The Weimar Art Collection shall be administered by the Director who is responsible for all its activities. He acts in the name of the Weimar Art Collection and is empowered to make decisions, on his own responsibility, on the basis of the provisions and plans which apply to its activities, as to all matters concerning the Weimar Art Collection.

(2) In the event the Director is prevented [from doing so], the Art Collection is to be administered by a deputy appointed by the Director.

(3) For the fulfilment of the tasks imposed on the Art Collection any necessary actions shall be taken, rights acquired and obligations assumed. The Director of the Weimar Art Collection is in particular empowered

—to conclude relevant agreements;

—to acquire, adminster, utilize and also dispose of the property;

—to prosecute any suits with respect to the property.

## § 4

### Representation in Legal Matters

(1) The Weimar Art Collection shall be legally represented through the Director and, in the event of his being prevented [from doing so], through the deputy appointed pursuant to § 3.

(2) The Weimar Art Collection may also be represented by other members of the staff or such persons as shall act within the scope of powers of attorney given to them in legal matters. Such powers of attorney are to be made in writing and only by the Director.

(3) In accordance with appropriate provisions for this, financial transactions require the participation and counter-signature by the chief accountant of the Weimar Art Collection, and in case of his being prevented [from doing so], by his deputy.

## § 5

### Board of Trustees

A board of trustees shall be established for the Weimar Art Collection for the purpose of advising on principal questions in its development. The chairman of the board is the Lord Mayor of the City of Weimar. He appoints the members of the board. The board of trustees shall be composed of eleven members. The board decides on its rules of procedure.

## § 6

### Manner of Work

(1) The work of the Weimar Art Collection shall be performed in accordance with a long-term work plan, which shall be prepared by the Director. The plan shall make provision for scientific research connected with the works of

art, publicity and educational tasks, as well as conservation and care (restoration and preservation).

(2) The annual plan shall be prepared on the basis of the long-term work plan.

## § 7

### Organization and Property

The Weimar Art Collection comprises:

(a) The Stadtschloss in Weimar as a building, that which is found in the historic rooms of the Stadtschloss, the Schlossmuseum and the gallery in the Schloss, as well as the restoration shops and other repair shops in the Stadtschloss, furthermore the former Landsmuseum on Karl-Marx-Platz Square as a building and art museum, the Schloss Belvedere as a building and art museum, the Kinsthalle on the Theaterplatz as a building and exhibition hall,

(b) as usufructary a part of the Orangerie in the Belvedere with the special collection of historic carriages as well as the ground floor of the Cranach-House on the Markt with the special equipment together with furniture and other objects of art

with all assets listed in the inventory of the Weimar Art Collection, including all rights and interests connected therewith.

## § 8

### Opening Times and Conducted Tours

(1) With a view to making available the Weimar Art Collection to the general public, open tours for viewing the objects are on weekdays, Sundays and public holidays.

(2) For the purpose of studies, access will be granted, if previously arranged, outside open hours.

(3) Visitors to the Art Collection will be charged a fee which shall be fixed by the Director in accordance with existing regulations.

## § 9

### Financing

(1) The budget of the Weimar Art Collection will be prepared by the Director in accordance with the tasks and the funds which are needed for the continued development of the Art Collection.

(2) Financing is effected.

(a) by way of income from admission fees and proceeds from sales;

(b) by way of subsidies granted from the budget of the City Council of Weimar.

## § 10

### Appointment and Dismissal as well as Engagement and Discharge of Staff Members

(1) The Director of the Weimar Art Collection will be appointed and dismissed by the Lord Mayor of the City of Weimar.

(2) The members of the staff of the Art Collection will be engaged and discharged by the Director within the framework of the staff plan and relevant legal provisions.

## § 11

### Publications

Publications of results of the work of the Weimar Art Collection shall be effected in accordance with relevant legal provisions and require approval by the Director.

## § 12

### Effective Date

This Statut is effective as of January 1, 1969. Weimar, April 16, 1969

### The Director

of the Weimar Art Collection
Sgd.   Gerhard Pommeranz-Liedtke

The foregoing Statut of the Weimar Art Collection of April 16, 1969, is confirmed.

Weimar, April 17, 1969

The Lord Mayor of the City of Weimar
Sgd. Prof. Dr. habil. Paul Ullman