# Possible Participation by the United States in
## *Islamic Republic of Iran* v. *Pahlavi*

As long as the government of Iran is recognized by the United States, it is entitled to maintain a lawsuit in any state or federal court; however, there is a substantial argument that the Iranian government's suit against the Shah to recover allegedly misappropriated governmental funds should be stayed or dismissed without prejudice in light of Iran's massive breaches of its treaty obligations to the United States and international law.

The courts have recognized the appropriateness of deferring to the Executive's foreign policy determinations in connection with claims or defenses based on doctrines of foreign sovereign immunity or act of state.

The Government's concerns over the effect of the litigation on our foreign policy provide a sufficient basis to support its standing to intervene in Iran's suit against the Shah, and there is precedent to support its intervention and assertion of cross-claims unrelated to the controversy in suit.

A respectable argument can be made that the Shah enjoys sovereign immunity from suit, under the 1976 Foreign Sovereign Immunities Act as well as customary international law, and the actions complained of appear to be acts of state. However, the present government of Iran may be able to waive the application of either of these doctrines to defeat its claims against the Shah, since both exist for the benefit of the state in question and not for the individuals who lead it.

January 2, 1980

## MEMORANDUM OPINION FOR THE
## ACTING ASSOCIATE ATTORNEY GENERAL

This memorandum responds to your questions concerning the possible role of the United States in the recently filed suit of the Iranian government against the Shah in the Supreme Court of the State of New York. (*Islamic Republic of Iran* v. *Pahlavi,* No. 79–22013, Nov. 28, 1979.) The suit advances several causes of action concerning alleged misappropriations of Iranian governmental funds by the Shah, and claims $56 billion in damages against him and his wife. This memorandum, which has been prepared in cooperation with the Civil Division and the U.S. Attorney's Office in New York, analyzes two major options for the United States in participating in the case. First, we might ask for the suit's stay or dismissal until the hostages are released, disclaiming any intent to intimate a position on the merits. The difference between a stay and a dismissal in this situation would be that since the Shah has departed the United States, a dismissal would terminate the court's personal jurisdiction over him, leaving Iran with only *in rem*

160

actions for his assets located here.[1] Second, we could intervene and cross-claim for relief, conceivably even relief unrelated to Iran's claims against the Shah. This memorandum also forecasts the ultimate result on the merits of Iran's claims against the Shah.

Our conclusions are these. First, as a government currently recognized by the United States, Iran is entitled to maintain a lawsuit in any state or federal court of competent jurisdiction. Second, the United States has a sufficient interest to support its standing to participate in some fashion. Third, we have a substantial argument that the New York state court should defer to a request by the Executive Branch to withhold itself from the merits, at least temporarily. Fourth, there is a respectable argument that we may intervene and bring unrelated cross-claims against Iran. Fifth, if the suit survives these initial procedural hurdles, there is a strong prospect that either sovereign immunity or act of state [2] doctrines will bar recovery against the Shah.

### I. Iran's Right to Sue

As a preliminary matter, it seems clear that if the United States were to withdraw diplomatic recognition from the government of Iran, the suit would be dismissed. *See Guaranty Trust Co.* v. *United States,* 304 U.S. 126 (1938). In *Guaranty Trust,* the Court observed that a foreign government may not maintain a suit in our courts before its recognition by the President. It cited a number of federal and state cases dismissing actions by the Soviet government before its recognition, among them a New York state court case, *Russian Socialist Federated Soviet Republic* v. *Cibrario,* 235 N.Y. 255, 139 N.E. 259 (1923). Although withdrawal of recognition would have the effect of voiding the suit against the Shah, as we discuss below it does not seem a necessary expedient to that end. Moreover, derecognition could have the collateral disadvantage of imperiling our present treaties with Iran, upon whose force we rely to assert the illegality of the conduct of its government.[3] The Legal Adviser's Office at the State Department has advised us that there is presently no serious contemplation of terminating recognition of Iran. There is, however, a range of unfriendly actions that this government might take, including severing diplomatic relations. In other cases, such

---

[1] The U.S. Attorney's Office in New York informs us that service of process in the suit was probably effective. New York law allows any service appropriate to meet the constitutional minimum of notice and an opportunity to appear. After failing to serve the Shah personally, the plaintiffs obtained an order allowing service on the hospital administrator, during the Shah's stay there.

[2] The "act of state" doctrine provides that a court may not review the validity of actions taken by a foreign sovereign within the sovereign's territory. *See generally, e.g.,* L. Henkin, Foreign Affairs and the Constitution 59–64, 216–21 (1972).

[3] It should be noted, however, that our recent withdrawal of recognition of the Republic of China (ROC) was accompanied by a presidential assertion that it would not have the effect of terminating existing treaties with the ROC. *See* the President's Memorandum for All Departments and Agencies of December 30, 1978.

as our longstanding dispute with Cuba, we have eschewed dere-cognition in favor of less drastic alternatives.

While recognition continues the courts retain jurisdiction, even in a climate of marked hostility. This is made clear by *Banco Nacional de Cuba* v. *Sabbatino,* 376 U.S. 398 (1964), in which the Court held that the act of state doctrine required American courts to recognize Castro's title to American sugar which he had expropriated, even though the act was in violation of international law. In *Sabbatino,* the Court responded to an argument that the National Bank of Cuba, an instrumentality of the Cuban government, should be denied access to the American courts because "Cuba is an unfriendly power and does not permit nationals of this country to obtain relief in its courts." The Court thought that the issue was one of national policy transcending the interests of the parties to the action, and observed that under principles of comity governing our relations with other nations, sovereign states are allowed to sue in our courts whenever they are recognized. The Court was unresponsive to arguments based on the severance of diplomatic relations, commercial embargo, and freezing of Cuban assets in this country:

> This Court would hardly be competent to undertake assessments of varying degrees of friendliness or its absence, and, lacking some definite touchstone for determination, we are constrained to consider any relationship, short of war, with a recognized sovereign power as embracing the privilege of resorting to United States courts.

376 U.S. at 410. The Court then remarked that its view was "buttressed by the circumstance that none of the acts of our Government have been aimed at closing the courts of this country to Cuba, and more particularly by the fact that the government has come to the support of Cuba's act of state claim in this very litigation." The effect on a court's jurisdiction if the Government takes the opposite position is considered below.

## II. Stay or Dismissal of the Proceedings

The essence of our substantive argument for a stay or dismissal without prejudice would be that Iran's massive breaches of both its treaty obligations to us and international law require appropriate reprisals to force return of the hostages and reparations. We would urge the court that temporarily withholding the aid of American courts to the Iranian government in its affirmative claims against the Shah and his assets would be a fair reprisal for the holding of the hostages. In support of our submission to the court, we could cite analogous precedent for judicial deference to executive formulations of foreign policy in sovereign immunity and act of state cases.

162

The substance of our claim would resemble our recent presentation to the World Court. We could begin by referring to Iran's treaty obligations to us under the Vienna Convention on Diplomatic and Consular Relations; the Treaty of Amity with Iran; and the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons. We could then summarize the facts, indicating breaches of a number of the provisions of these treaties. We could then point out that these treaties and surrounding principles of customary international law (which include doctrines of reprisal) have been incorporated as part of our domestic law. Article VI of the Constitution makes treaties part of the supreme law of the land, along with the Constitution and statutes. The Vienna Convention on Diplomatic Relations includes an affirmation in its preamble that rules of customary law should govern questions not expressly regulated by the terms of the Convention. And the Supreme Court has recognized customary international law as part of our domestic law.[4]

Customary international law allows reprisals, which are breaches of a treaty's terms or other unfriendly conduct in response to a breach by another party. Reprisals must, however, respond in a proportionate manner to the preceding illegal act by the party against whom they are taken. *See* G. Schwarzenberger, A Manual of International Law 184 (5th ed. 1967). The proportionality of a reprisal in a particular case is a matter largely committed to judgment and precedent.

The Iranian breaches in this case are massive and largely unprecedented; reprisals even more severe than asset freezing and a temporary closing of forum doors would probably be appropriate, for example total embargoes and blockades. Nevertheless, the Iranians could urge that a denial of access to the courts is a particularly serious matter under the U.S. Constitution, and that the Supreme Court has refused to allow the closing of the courts even during the domestic insurrection of the Civil War. *(See Ex Parte Milligan,* 71 U.S. (4 Wall.) 2 (1866)). Numerous rejoinders suggest themselves. First, we could emphasize that we are urging only a temporary denial of access to our courts while the hostages are held, and that we would not seek to interfere with the prosecution of a suit after their release. (Because the Shah has left the country, however, dismissal would leave Iran with only *in rem* claims against his assets. In that sense, even dismissal without prejudice would permanently close our forum to some of Iran's claims.) Second, we could point out that Iran has refused to follow the World Court's

---

[4] In *The Paquete Habana,* 175 U.S. 677, 700 (1900), the Supreme Court held that under international law, fishing vessels belonging to enemy nationals were exempt from capture and condemnation by American vessels:

> International law is part of our law, and it must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.

The *Cibrario* case, cited *supra,* is one example of the New York Court of Appeals' application of principles of international law in conformity with this principle.

order to release the hostages, or otherwise to obey the dictates of international law that they be freed. The "unclean hands" analogy is obvious. Third, *Sabbatino* implies that a Government request to close the courts could be an appropriate response to a foreign nation's denials of redress—that an executive branch request could provide the "definite touchstone for determination" that standing should be denied. And fourth, foreign nations do not have any claim to seek the aid of our courts without the interference of our executive branch.[5] For when they are unrecognized they may not sue at all; when they are allowed to sue, the Government may affect the outcome on the merits by interposing or withdrawing the defenses of sovereign immunity and act of state, as we discuss in more detail below.

### III. Judicial Deference to Executive Branch Formulations of Foreign Policy

This brings us to the question of the respective roles of the federal executive and a state court in deciding whether Iran shall be allowed to maintain this lawsuit. Here there is a long history of deference by courts to executive foreign policy determinations regarding foreign claims or defenses that are affected by doctrines of immunity or act of state. Since these two doctrines affect the outcome of a case on the merits, it seems likely that a court would treat a request for a temporary stay or dismissal that is based on foreign policy according to the same principles.

In *Ex Parte Republic of Peru*, 318 U.S. 578, 589 (1943), the State Department had "recognized and allowed" the immunity of a merchant vessel owned and operated by the Peruvian government. Accordingly, the Court held that an *in rem* action against the vessel should be dismissed. The Court said:

> The [Department of State] certification and the request that the vessel be declared immune must be accepted by the courts as a conclusive determination by the political arm of the Government that the continued retention of the vessel interferes with the proper conduct of our foreign relations.[6]

---

[5] Chief Judge Kaufman of the Second Circuit Court of Appeals remanded the case of *Electronic Data Systems* v. *Iran* on November 29, 1979, in part for the following determination:

> On remand the district court may ascertain the position of the Department of State concerning the defendant's right of access to United States courts under the extraordinary circumstances now prevailing.

610 F.2d 94, 95 (2d Cir. 1979).

[6] Two years later, in *Republic of Mexico* v. *Hoffman*, 324 U.S. 30, 36, 38 (1945), the Court elaborated further:

> But recognition by the courts of an immunity upon principles which the political department of government has not sanctioned may be equally embarrassing to it in securing the protection of our national interests and their recognition by other nations.

\*      \*      \*      \*      \*

Continued

The Second Circuit Court of Appeals then decided cases in much the same vein. *See Bernstein* v. *Van Heyghen Freres,* 163 F.2d 246 (2d Cir. 1947), *cert. denied,* 332 U.S. 772 (1947); *Bernstein* v. *N.V. Nederlandsche-Amerikaansche,* 173 F.2d 71 (2d Cir. 1949). In the latter, after the court had applied the act of state doctrine to bar review of Nazi expropriations, the State Department wrote a letter to the court saying:

> The policy of the Executive, with respect to claims asserted in the United States for the restitution of identifiable property . . . lost through . . . duress as a result of Nazi prosecution in Germany, is to relieve American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials.

The court of appeals responded by holding that the doctrine would not apply in view of this supervening expression of executive policy, and revised its mandate. *Bernstein* v. *N.V. Nederlandsche-Amerikaansche,* 210 F.2d 375, 376 (2d Cir. 1954).

Before the Supreme Court suggested that courts should defer completely to executive discretion regarding the need to apply sovereign immunity doctrine in a particular case, the New York Court of Appeals had taken a position that retained a more active judicial role. In *Anderson* v. *N.V. Transandine Handelmaatschappij,* 289 N.Y. 9, 43 N.E.2d 502 (1942), a New York resident sued a Netherlands firm for converting securities and monies owned by his assignor, on a cause of action arising in the Netherlands. The defendants answered that a decree of the lawful government of the Netherlands had vested title to the property in the government. The question was therefore the effectiveness of the decree. The State Department, through the U.S. Attorney, applied to the court of appeals for leave to appear and file "A Suggestion of the Interest of the United States in the Matter in Litigation." [7] The Suggestion of Interest began by identifying the interest of the United States in the subject matter as the effect of the court's decision on the foreign policy of the United States. The Government outlined the applicable policy and urged the court to affirm the decision below, dismissing the suit.

To the court of appeals, the question was whether the action of the Netherlands offended New York public policy. [8] The confiscation

---

We can only conclude that it is the national policy not to extend the immunity in the manner now suggested, and that it is the duty of the courts, in a matter so intimately associated with our foreign policy and which may profoundly affect it, not to enlarge an immunity to an extent which the government, although often asked, has not seen fit to recognize.

[7] The U.S. Attorney stated in his application that "in the interest of orderly procedure" the matter was being presented by motion for leave to file, though he questioned whether leave of the court was necessary. 43 N.E.2d at 505.

[8] The court summarized its view of the law: "By comity of nations, rights based upon the law of a foreign State to intangible property which has a situs in this State, are recognized and enforced by the courts of this State, unless such enforcement would offend the public policy of this State." 43 N.E.2d at 506.

involved, having occurred during the emergency of World War II, did not offend the sensibilities of the court. Having decided the issue, the court continued in dictum that it need not consider whether the State Department's formulation of policy could change judicial questions determined in the New York system into political questions which would allow the Department of State to supersede the public policy of the state. The court recognized there might be situations in which that power should exist, for example where the public policy of a State would interfere with the performance of an executive agreement (such as the assignment of Russian claims to the United States that was upheld in *United States* v. *Pink,* 315 U.S. 203 (1942)). The court thought that allowing State Department policy formulation to override the public policy of a state might involve "very serious consequences" in some cases, but could have no untoward consequences where, as here, the State Department and the state were in agreement.

In its reservation concerning the conclusive effect of the State Department's formulation of policy, the New York Court of Appeals foreshadowed developments to come in the formulation of the relevant doctrines. In *Banco Nacional de Cuba* v. *Sabbatino,* 376 U.S. 398 (1964), the Supreme Court placed the act of state doctrine on a new footing somewhat less deferential to Executive Branch formulations than the old immunity cases. In *Sabbatino* the Court's recognition of Castro's title to the American sugar accorded with the request of the Executive Branch. Nevertheless, the Court went out of its way to reformulate the doctrine as law created by the federal courts on their own authority, not as a direct reflection of national policy as promulgated by the Executive. The Court said:

> The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere. . . . Whatever considerations are thought to predominate, it is plain that the problems involved are uniquely federal in nature. If federal authority, in this instance this Court, orders the field of judicial competence in this area for the federal courts, and the state courts are left free to formulate their own rules, the purposes behind the doctrine could be as effectively undermined as if there had been no federal pronouncement on the subject. . . . [W]e are constrained to make it clear that an issue concerned with a basic choice regarding the competence and function of the Judiciary and the National Executive in ordering our relationships

166

with other members of the international community must
be treated exclusively as an aspect of federal law. . . .

376 U.S. at 423-25. Thus, the decision made act of state a component of federal common law, and expressly said that this was one of those "enclaves of federal judge-made law which bind the States." At the same time, the Court realized that New York law also accepted the doctrine, and would have reached the same result. *Id.* at 426.

In *First National City Bank* v. *Banco Nacional de Cuba,* 406 U.S. 759 (1972), the Cuban government sued to recover assets held by the bank; the bank counterclaimed for the value of its properties which Cuba had confiscated. In the lower courts, the Department of State communicated a "determination by the Department of State that the act of state doctrine should not be applied to bar the counterclaim." The Court of Appeals disregarded the Department and applied the doctrine to dismiss the counterclaim. The Supreme Court reversed, but only a plurality of three Justices thought that the Court should give conclusive effect to State Department policy; six Justices explicitly rejected the doctrine that the courts are bound to follow the Executive in such cases.

Thus, the Supreme Court's two recent cases on act of state suggest that the earlier immunity cases, which were not strictly in point and were not mentioned, were somewhat overstated. Nevertheless, all of the cases have recognized the appropriateness of Executive Branch communications to the courts expressing foreign policy concerns over application of the defense doctrines in particular lawsuits.

If the Executive may urge the courts to reach a particular outcome on the merits, surely it may urge a temporary stay or dismissal for the same kinds of reasons. At the same time, it is now difficult to argue that executive determinations are conclusively binding on the courts, even in contexts related to but not subsumed within the act of state doctrine. The courts will not promise to accede to State Department policy views; by the same token, deference is likely to occur in true crisis situations such as the present one, where the Department of State can give good reasons, grounded in the complexity of foreign policy, for urging a particular disposition. Thus, *Sabbatino*'s discussion of closing the forum to foreign governments suggests that a State Department request to deny standing might have received deference in that case, and should receive deference in this one.

In making its decision on a stay or dismissal motion in Iran's suit against the Shah, the New York court could draw on either of two sources of law. One would be the federal common law principles of the two recent Supreme Court cases, to the extent that they now govern beyond the act of state context. Here an argument can be made that the functional considerations the Court advanced should make federal common law govern whenever foreign policy concerns have direct

impact on domestic litigation, and that the Court's deference to Executive Branch submissions should apply as well. Alternatively, we could invoke the state law public policy doctrine of *Anderson, supra,* to the extent it survives *Sabbatino.* We have not researched the New York public policy cases, but an argument to basic equity principles such as "unclean hands" seems one possibility.

## IV. Cross-claims

Instead of seeking to delay or dismiss the suit, we could attempt to intervene in the lawsuit as a party, seeking affirmative relief. Intervention as a party might allow us to assert a cross-claim against the plaintiff "Islamic Republic" under the doctrine of *Republic of China* v. *First National City Bank,* 348 U.S. 356 (1955). In allowing a party sued by an otherwise immune sovereign to assert any claim of its own against that sovereign, *Republic of China* emphasized considerations of "fair dealing." Thus, Iran has waived its immunity from suit to at least some extent by invoking the aid of our courts. *Republic of China* held explicitly that a counterclaim need *not* be related to the subject matter of the plaintiff's claim. The case does not provide direct precedent, however, for third party intervention to assert claims, some of which might bear no relation to the controversy in suit. Nevertheless, the emphasis on "fair dealing" in *Republic of China* suggests that the Government might have a special argument that Iran's use of our courts to pursue its case against the Shah should subject Iran to all claims the United States may have against it. Such an argument would derive from the Government's power to deny Iran a forum entirely (by withdrawing recognition) or partially (by urging the courts to allow the interposition of defenses). Therefore, by bringing a lawsuit that depends for its success on cooperation by our Government, Iran may open itself to our own claims against it. Perhaps, however, our rights in the matter would be limited to any of the Shah's assets the court may decide to be those of Iran.

## V. The Interest of the United States in this Litigation

In order to participate in Iran's suit against the Shah, the Government must demonstrate a sufficient interest in the litigation to support its standing. The nature of the interest asserted would depend on the nature of the Government's position. If we decide to ask for stay or dismissal of the case, our concerns about the effect of the litigation on our foreign policy would provide a sufficient interest. That is implicit in the numerous cases receiving government communications on the sovereign immunity and act of state doctrines. Also, at least some support could be drawn from cases recognizing the Government's standing to sue to enforce its treaties (*e.g., Sanitary District* v. *United States,* 266

U.S. 405 (1925)). Here we would be seeking to enforce a treaty reprisal through the judicial process.

On the other hand, if we seek to intervene and cross-claim ordinary standards for intervention in New York would probably apply. These are discussed below.

### VI. The Government's Strategy Choices

The Government might eventually take any of a number of policy positions with regard to this lawsuit. Therefore, it is important to avoid a hasty submission to the court that might foreclose later options. There are at least the following possibilities:

1) Request for a temporary stay.
2) Request for dismissal without prejudice.
3) A request that the court honor the Shah's sovereign immunity and act of state defenses.
4) A request that the court disregard the Shah's defenses.
5) Intervention with a cross-claim against Iran.
6) Our substitution as plaintiff for Iran pursuant to an assignment of its claims against the Shah. (This presently seems remote, but it has occurred in the past. *E.g., United States* v. *Pink*, 315 U.S. 203 (1942).)
7) Expansion of the current freeze to include the assets of the Shah or all Iranian nationals. This could be accomplished without communicating with the court, but with indirect effect on the litigation.

First, a temporary stay could be sought without foreclosing our other options. Since the court is likely to be expecting a communication from us on the applicability of the defense doctrines, we could and should be explicit that our stay request intimates no position on the merits. A request for dismissal without prejudice, however, could lead to the foreclosure of our opportunity to counterclaim, if the request is granted and Iran does not file an *in rem* action.

Submissions to the court regarding the defense doctrines are not fully consistent with a cross-claim. For if the Government were to intervene, claiming the assets insofar as they .are adjudged to belong to Iran, we would be in no position to file suggestions that immunities or act of state should be waived to our pecuniary benefit. Perhaps, however, the situation would be different were we asking for a general judgment against Iran, without regard to the ownership of these assets.

An early submission suggesting that the defense doctrines be applied in the Shah's favor might prevent the Government from taking a later assignment of Iran's claim. It therefore seems best to avoid taking any position on the applicability of the defenses for the time being.

169

An expansion of the freeze to include these assets does not seem inconsistent with any of the possible actions to be taken in the litigation. It should not be necessary to take a position on the ultimate ownership of the Shah's assets in order to freeze them as property in which Iran or an Iranian national has an interest.

## VII. Modes of Participating in the Lawsuit

The precedents cited above indicate a number of alternative means by which the Government's position can be communicated to the court:

### A. Letter

A letter can be written to the Administrative Judge, First Judicial District, Supreme Court of the State of New York. (Under New York procedure, this case will not be assigned to an individual Justice until it requires some form of judicial action, as when a party files a motion requiring adjudication.)

### B. Suggestion of Interest

A "Suggestion of Interest of the United States" can be filed, as was done in *Anderson, supra. See also Federal Republic of Germany* v. *Elicofon,* 358 F. Supp. 747 (E.D.N.Y. 1972), *affirmed on opinions below,* 478 F.2d 231 (2d Cir. 1973) (expressing the Government's non-recognition of East Germany and recognition of West Germany).

### C. Amicus Curiae

New York law neither forbids nor generally defines *amicus curiae* submissions, except for the Court of Appeals, which specifically permits them under general criteria which this case would satisfy. New York Court Rules § 500.9(e) (1978). The *amicus* vehicle is, however, frequently employed in both the Supreme Court and the Appellate Division by means of a motion on notice for permission to file. It is recognized indirectly, *e.g.* N.Y. Civ. Prac. Law § 1012(c) (McKinney 1980), and in all likelihood would not be rejected. Of course, our appearance *amicus* would not accord the Government the right to appeal.

### D. Intervention

The Government could intervene as of right, N.Y. Civ. Prac. Law § 1012, or by permission, § 1013. Intervention must be "timely." We have found no cases of intervention by the United States in New York courts under the modern rules, and no discussions of early intervention. Understandably, the cases have focused on tardy intervention, and have allowed it as late as the eve of trial or even post-judgment, unless intervention would delay the case unnecessarily or confuse the issues.

*See Stanford Associates* v. *Board of Assessors,* 39 A.D.2d 800, 332 N.Y.S.2d 286 (3d Dep't 1972); *Auerbach* v. *Bennett,* 64 A.D.2d 98, 408 N.Y.S.2d (2d Dep't 1978).

The standards for intervention as of right are as follows:

> Upon timely motion, any person shall be permitted to intervene in any action:
>
> 1) when a statute of the state confers an absolute right to intervene; or
>
> 2) when the representation of the person's interest by the parties is or may be inadequate and the person is or may be bound by the judgment; or
>
> 3) when the action involves the disposition or distribution of, or the title or a claim for damages for injury to, property and the person may be affected adversely by the judgment.

N.Y. Civ. Prac. Law § 1012(a).

To intervene as of right the Government can argue that it may be "bound" by the judgment due to its effects on foreign policy; we can notify the court that we may make a submission later concerning whether immunity or act of state doctrines should bar the claim. Alternatively, we could argue that this action involves the disposition of property, *i.e.* the Pahlavi Foundation building in New York and any other such assets, and that the United States would be affected by a judgment in that we might claim the assets ourselves, if held to belong to Iran. There appears to be no precedent in New York law for arguments not based on our own claims to these assets (indeed, the New York courts have interpreted this provision largely in terms of commercial interests, *see Cavages, Inc.* v. *Ketter,* 56 A.D.2d 730, 392 N.Y.S.2d 755 (4th Dep't 1977)). Still, it is difficult to imagine that intervention in some form will not be allowed in view of the circumstances. Moreover, New York's rules were adapted from the federal rules, and were meant to broaden their scope and to liberalize them. *See* 12 N.Y. Jud. Council Rep., 163, 218–32 (1946); *see also* 2 Weinstein, Korn & Miller, New York Civil Practice 1012.04 (1978). Thus, in view of New York's general inclination to take guidance from the Federal Rules of Civil Procedure, and the liberal interpretation given Rule 24, Fed. R. Civ. P. and its predecessors, intervention as of right might have a good chance of success. *See, e.g., SEC* v. *U.S. Realty,* 310 U.S. 434 (1940) (permitting the SEC to intervene to protect the integrity of its regulatory framework).

If at this point in the litigation the Government decides to make arguments for stay or dismissal that are essentially unrelated to the property involved in the lawsuit, it may be more politic to invoke the

liberal standard for permissive intervention,[9] although New York appears to make little distinction between the two standards. We could identify common questions of law or fact as those bearing on any submission to be made in the litigation concerning immunities or act of state doctrine.

## VIII. Iran's Prospects on the Merits

The complaint alleges that the Shah was the *de facto* ruler and head of state of Iran from 1941 until January 1979. The acts complained of are alleged to have taken place in Iran during the period that the Shah was the ruling monarch. The complaint is devoid of allegations that the Shah engaged in any of the acts complained of in the territory of the United States or at a time subsequent to January 1979 when he presumably ceased to be the head of state of Iran.[10] Based on these allegations, the acts alleged appear to constitute acts of state.

A respectable argument can also be made that the Shah enjoys sovereign immunity from suit.[11] Restatement (Second) of the Foreign Relations Law of the United States, § 66 (1965), states in pertinent part:

§ 66. Applicability of Immunity of Foreign State

The immunity of a foreign state under the rule stated in § 65 extends to
   (a) the state itself;
   (b) its head of state and any person designated by him as a member of his official party;
   (c) its government or any governmental agency; . . .

The 1976 Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.,* does not expressly address the privileges and immunities of reigning monarchs, but talks only in terms of "foreign states." Nevertheless, under the Restatement formulation, *supra,* it is arguable that a reigning monarch enjoys the immunities of a "foreign state" as codified in the Act.

---

[9] To intervene by permission:
> Upon timely motion, any person may be permitted to intervene in any action when a statute of the state confers a right to intervene in the discretion of the court, or when the person's claim or defense and the main action have a common question of law or fact. In exercising its discretion, the court shall consider whether the intervention will unduly delay the determination of the action or prejudice the substantial rights of any party.

N.Y. Civ. Prac. Law § 1013.

[10] It is not clear whether the Shah did, in fact, cease to be head of state of Iran after he left Iran in January 1979. The Shah himself has never abdicated; the United States government has never pronounced that it no longer recognizes the Shah as the reigning monarch of Iran.
   Although it is manifest that the Shah no longer exercises *de facto* governmental powers, it is not unusual in international law to treat fictions as realities. Thus, the United States recognized as the *de jure* government of Russia from 1917 until 1933 the Kerensky government, even though Mr. Kerensky had fled the Soviet Union in 1921.

[11] In *Hatch* v. *Baez,* 14 N.Y. (7 Hun) 596 (1876), the court held that the acts while in office of a former head of state were immune from judicial scrutiny. The court's decision is phrased in terms suggestive of both act of state and sovereign immunity doctrines.

Section 1605(a)(5) preserves the immunity of foreign states from suit with respect to—

> (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or
>
> (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

The tortious and wrongful acts alleged in the complaint would probably fall within the above exceptions of the Act.

Alternatively, if the Act were construed not to apply to personal monarchs, the Shah would be entitled to immunity under generally recognized doctrines of customary international law. *See* 1 Oppenheim's International Law 676 ff. (Lauterpacht ed., 7th ed. 1953).

Since either act of state or sovereign immunity may defeat Iran's claims against the Shah if applied in this case, it is important to consider whether the present Iranian government may waive the application of these doctrines to the acts of its predecessor. There appears to be a paucity of authority on point. As an *a priori* matter, it seems that Iran might be able to waive the doctrines, at least if our submission to the court urges allowing them to do so.[12] Both doctrines exist for the benefit of the state in question, not for the individuals who lead it. Therefore it seems incongruous to apply the doctrines to defeat a claim by a state for its own assets converted by a former monarch.

LARRY A. HAMMOND
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[12] Analogy may be taken to the pattern of diplomatic immunities and then waiver. Under the Vienna Convention on Diplomatic Relations, the sending state may waive a diplomat's immunity (art. 32). Absent waiver, however, immunity for the exercise of official functions subsists after the diplomat's appointment has terminated (art. 39.2).